### STATE v. AL PALMERSTEN.[1]

June 20, 1941.

No. 32,776.

[1]Reported in 299 N. W. 669.

*Neil Hughes, Don E. Morgan, Paul G. Fisch,* and *John Ott,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Charles Houston,* Special Assistant Attorney General, *Ed J. Goff,* County Attorney, and *Per M. Larson,* Assistant County Attorney, for the State.

JULIUS J. OLSON, JUSTICE.

Convicted of willful neglect of official duty as a police officer in Minneapolis (2 Mason Minn. St. 1927, § 9970) and sentenced to a workhouse term, defendant appeals from the judgment and from an order denying his motion for a new trial.

The record fully justified the jury in finding the following facts: Over a period of more than 20 years defendant was a member of the police department of Minneapolis, at least four years of which had been spent as a member of the "purity squad." During the time here involved he was in charge of the "morals squad." In that capacity it was his duty to "secure evidence and make arrests" for violation "of liquor, gambling and vice" ordinances of the city. More particularly, his duties included the "ferreting out [of] disorderly houses." He knew what his official duties were and was well acquainted with the general situation in respect of such places in his city, including as well the particular house of ill fame here involved. Not only had he visited it on various occasions but

he also knew its reputation to be just that. He had been there looking for some "girls" and had ordered some of them to appear before a member of the Minneapolis health department, the object obviously being to ascertain whether they were afflicted with any of the so-called social diseases. Pursuant to his orders, Betty Ryan, the one who operated the place, told him that she would have the girls brought down, and "they went downstairs." The Ryan "joint" included two floors at 242 Hennepin avenue. There were 18 rooms. Mrs. Ryan was well acquainted with defendant and frequently met him, generally at the "Stockholm Cafe." During the year 1939 and until a raid was made in the early morning of January 11, 1940, she sold liquor and "had girls up there." From April, 1939, and until the time of the mentioned raid, one Irene Hinman assisted her in running the place. At defendant's request, perhaps we should say demand, Betty Ryan paid him $300 in one lump sum payment. This she did by putting $300 of currency in an envelope and dropping it in a slot at the morals squad office. The name "Al Palmersten" was written on the envelope. A few hours later she telephoned defendant and asked him if he had received "that," and he replied, "Yes, thanks very much." The Ryan woman paid defendant at the rate of $50 per month, and the payments were handled in this fashion: Irene would get the envelope containing the $50, meet defendant at the Stockholm Cafe, and slip the envelope into his pocket. This was a matter of monthly custom.

The Ryan place, located in the very heart of the business section of Minneapolis, was raided during the early morning hours of January 11, 1940, by deputy sheriffs acting under direction of the sheriff's office. Apparently defendant was not informed. The reason this was not done is rather an obvious one. At any rate, at the time of the raid 19 men and 8 women were found there by the officers. A recital of what the officers otherwise found, saw, and heard need not be made since that would only smear our records with an account of the unwholesome, impure, and lustful mis-

conduct of those found there. In the neighborhood the reputation of this place as a house of ill fame was well established. Men were seen entering and coming out during the nighttime. The door leading into the house had a chain on it. A window seen from the hallway had iron bars protecting it. There was a peek hole in the door.

Prior to the raid and on December 29, 1939, an indictment was returned against Mrs. Ryan charging her with keeping a house of ill fame at the mentioned place. She was convicted and sentenced. Since the raid the place has been closed.

In November, 1939, a well known and reputable lawyer of Minneapolis wrote the mayor in an effort to locate the whereabouts of a daughter of one Mr. Hinman, the daughter's name being Irene. She had been away from her home and customary place of abode, and her father was anxious to locate her. Irene testified that she talked with defendant about this letter. Defendant wanted to know how old a man the lawyer was. He told her, "I will tell George [meaning the mayor] in the morning there is nothing to this letter, that you weren't up at 242 Hennepin avenue." He then suggested, "Why don't you frame him so he won't bother you any more?" Continuing, he said, "Get him up to some hotel and both of you go up there to the hotel and let me know what hotel it is, and we will walk in on you and I will talk real nasty to make believe I am taking you down to headquarters, and we will scare the pants off him and then maybe he won't write any more letters about you to the police department or to the mayor."

Enough has been recited, we think, to make plain that as the "head of the morals squad," having in charge the "morals of the city of Minneapolis," defendant must have gone about his business blindfolded and wholly deaf if he did not know what was going on at 242 Hennepin avenue. If conduct on his part such as here shown does not warrant conviction under the cited statute, what safety is there left for the decent people of Minneapolis or any other center of population? We are convinced that upon this rec-

ord, taken as a whole, there can be no reasonable doubt of defendant's guilt. True, much of the evidence came from the mouths of Mrs. Ryan and Irene. But who better than they were conversant with the facts? Then, also, there is much evidence in the way of corroboration by people who cannot be charged with the ill-smelling repute justly attaching to the testimony of these women.

■ Defendant devotes much of his brief to a discussion of claimed errors in overruling his objection to hearsay evidence in respect to the character of the Ryan place and the conversations heard by the officers when the raid was made. Of course, it was for the state to prove all the material allegations of the indictment. One of these necessarily was proof of the place as one of ill fame—one where persons went for unlawful sexual intercourse and for lewd, obscene, and indecent purposes. The character of a place of this kind properly may be proved by showing how and in what manner it is conducted. Here, as in State ex rel. O'Brien v. Terrett, 131 Minn. 349, 350-351, 154 N. W. 1073, 1074:

"The character of a place is properly proved by showing how it is conducted. What the occupants do and say and how they act characterize it. Such evidence is not hearsay. What was found when the raid was made, and the character of the occupants, all were proper to be shown on the question whether a disorderly house was being maintained and this was one of the issues. One desirous of finding the real character of the house would avail himself of such proof as highly satisfactory; and there is no mystery in the administration of the law which requires its exclusion."

So, also, in State v. Rogers, 145 Minn. 303, 177 N. W. 358, a prosecution for keeping a house of ill fame, the court held that testimony showing the character of those who visited it and what they said and did while there is competent for the purpose of showing the character of the place. *Cf.* State v. Riebe, 174 Minn. 603, 604, 218 N. W. 557; State ex rel. Goff v. Minneapolis Brg. Co. 189 Minn. 147, 148, 248 N. W. 715. And in State v. Brand, 124

Minn. 408, 409, 145 N. W. 39, in a prosecution by the state on a charge of selling intoxicating liquor to a public prostitute, it was held that the court properly admitted evidence as to defendant's reputation, saying: "When it is necessary to establish the character of a person as to chastity or unchastity, evidence of the reputation of such person in that respect is proper." (Citing numerous authorities.)

Reputation in the community is admissible under many circumstances. The cases on the subject are found in 2 Dunnell, Minn. Dig. (2 ed. & Supps.) § 3299, especially under note 11.

After all, do not such words as house of "ill fame," "evil fame," or "repute" speak for themselves and as such give name and character to the place? The cases generally recognize that these words are synonymous with the word "lewd," and in common parlance mean a place or house resorted to for the purpose of prostitution. We think there was no error in respect to reception of this type of evidence.

■ Error is also assigned with respect to the court's ruling relating to the impeaching testimony sought to be introduced by the witness Alma Jackson. She was one of the "girls." In the preliminary examination conducted by defendant's counsel it appears that the witness had talked only with "some of the other girls up there." She had also observed for herself Irene's traits in respect to "her truth and veracity." Defendant's counsel then asked:

"From what you observed yourself and talks you had with other girls do you know what her reputation was at 422 Hennepin as to being a truthful or untruthful person? Answer 'yes' or 'no.' "

There was objection by the state and the court said:

"Oh, I think you should lay some foundation for her testimony as to the reputation of this woman, rather than the testimony of a few girls that she has talked with."

Counsel then proceeded as follows:

Q. "Did you ever discuss her reputation with any other person outside of [those] up there?

A. "No.

Q. "That is the only place?

A. "Yes.

Mr. Hughes: "That is all."

The general rule is that to successfully impeach the testimony of a witness it is necessary that the impeaching witness first be asked if he is acquainted with the reputation of the witness as to truthfulness in the community in which the latter resides. If he is, he should next be asked what that reputation is, and, finally, if the answer is that the reputation is bad, he should be asked whether from his knowledge of such reputation he would believe the witness under oath. 6 Dunnell, Minn. Dig. (2 ed.) § 10353(b), where the supporting cases are found under notes 92 to 95, inclusive.

Undoubtedly capable and alert counsel for defendant were well aware of this rule and for that reason concluded that his witness had not qualified. No offer of proof and no further effort was made to qualify the witness. We can see no error here.

■ Officer Bleed of the police department was called as a character witness by defendant. He testified that he was acquainted with defendant and had talked with other members of the department and other persons known to him. He was asked what defendant's record had been in the department. On objection by the state this was sustained. Counsel then proceeded as follows:

Q. "Have you ever discussed Mr. Palmersten's reputation for truth and veracity with any other persons?

A. "I have.

Q. "Anybody else besides police officers?

A. "No.

\* \* \* \* \* \*

Q. "Do you know what Mr. Palmersten's general reputation is and was on the 11th of January, 1940, as to truth and veracity?

A. "Good.

Q. "Do you know what his reputation was on the 11th day of January, 1940, as to being an honest and efficient officer?"

The state objected on the ground of lack of foundation, and this objection was sustained. Error is claimed in respect to this ruling.

It is well to bear in mind that the question of adequate foundation being first laid lies largely within the discretion of the trial court. State v. Barnard, 176 Minn. 349, 351, 223 N. W. 452, and cases cited. While we should have preferred to have the court permit the witness to answer, we are not persuaded that defendant was prejudiced. The witness had testified that defendant's reputation as to truth and veracity was "good." If the jury believed such to be his reputation, it is wholly unlikely that anything would be added by opinion testimony of the kind sought. If his reputation was "good" generally, the jury could not very well say that it was otherwise in the performance of his duty as head of the "morals squad." Furthermore, reputation must be that of a general consensus of opinion on the part of those who reside in the neighborhood of the witness. It has as a basis for its existence what has been heard and said amongst the members of the community in which one lives and acts. 5 Wigmore, Evidence (3 ed.) § 1615. As said in Waddingham v. Hulett, 92 Mo. 528, 534, 5 S. W. 27, 28: "A man's character is to be judged by the general tenor and current of his life and not by a mere episode in it." We conclude that the error, if any, was harmless.

There are other assignments of error, amongst them one relating to the county attorney's address to the jury. We have examined these and do not find that they present anything needing special treatment.

The judgment and order are both affirmed.

PETERSON, JUSTICE (concurring specially).

In my judgment, we should say explicitly that excluding officer Bleed's testimony was error. As to that there should be no mistaking our decision. But the error was not substantial in the light of all the facts in the case. It appears from the whole record that the defendant was not prejudiced by excluding the

testimony. For that reason, the error was harmless and not ground for a new trial. State v. Huebsch, 146 Minn. 34, 177 N. W. 779; State v. Williams, 96 Minn. 351, 105 N. W. 265; 2 Dunnell, Minn. Dig. (2 ed.) § 2490.

STONE, JUSTICE (concurring).

I concur in the opinion of Mr. Justice Peterson.