## STATE v. HARLEY M. SORENSON.

134 N. W. (2d) 115.

January 29, 1965—No. 38,998.

*Lewis E. Lohmann* and *Paul W. Lohmann,* for appellant.

*Walter F. Mondale,* Attorney General, *George M. Scott,* County Attorney, and *Philip J. Bloedel,* Assistant County Attorney, for respondent.

NELSON, JUSTICE.

A jury found defendant guilty of burglary in the second degree and he appeals from the order of the trial court denying his motion for a new trial.

The state, by information duly filed, accused defendant of breaking and entering Roberta Mowrey's apartment at 2639 Colfax Avenue South, Minneapolis, Minnesota, on or about April 28, 1962, during the nighttime and while Mrs. Mowrey was in the apartment.

Defendant, who had been arrested without a warrant, entered a plea of not guilty and moved for an order suppressing as evidence property seized as a result of a search of his person and automobile at the time of his arrest, and any evidence derived as a direct result of such search and seizure. Defendant also requested that the state be directed to return such property to him. He assigns the denial of his motion as error.

The salient facts as disclosed by the record are as follows: The Minneapolis Police Department received a telephone call about 5:30 a. m., April 28, 1962, by which they were informed that Mrs. Mowrey's apartment had been burglarized and that she had been assaulted by the burglar. She described the burglar at the time as a white male, about 30 years of age, more than 6 feet tall, weighing 200 to 220 pounds, with light-colored hair, worn in a crew cut, and said that he was wearing a scarf over his face.

Mrs. Mowrey lived alone in her basement apartment at 2639 Colfax Avenue South. On April 26, 1962, she spent the evening with friends at the Dyckman Hotel in Minneapolis. When she left the hotel about 1:15 a. m. to take a taxi, a man in a passing car stopped and asked her if she would like a ride home. She accepted the offer

and upon arriving at her apartment she expressed her appreciation to the driver and went into her apartment alone. She discovered the following day that $50 which she had carried in her purse the evening before was missing, as were her apartment keys. Mrs. Mowrey does not know whether she locked the apartment door on the morning of the 27th before going to bed. It appears, however, that shortly after midnight the following day, April 28, a Mr. Kennedy, whom she had been dating, arrived at her apartment and invited her to accompany him to a tavern for refreshments. She accepted but they arrived too late to be served and returned to the apartment. About 3 a. m. both heard a noise and immediately looked about the apartment but did not discover anyone. About 4:45 a. m., after Mrs. Mowrey had gone to bed, she awoke to find a man pulling down the bed covers. Her next recollection is seeing the man standing in the living room, staring into her bedroom. She got up, put on a robe, and ran into the living room where the intruder stood, with gloves in his right hand, his left hand holding a maroon scarf around his face and head. As she came into the living room the intruder grabbed her by the arms and said, "Don't make trouble because I have pictures of you." She next saw her purse lying open on the floor and said, "You are the man that took my money and keys." The intruder replied, "Yes, I did, they are out in the car." He then pushed her toward the couch and said, "I am going to have you." She immediately screamed and said, "You stole my money again," and at this time grabbed the upper part of his arms. The two grappled and she called to Mr. Kennedy, who had remained at the apartment. By this time the intruder was going out the front door, Mrs. Mowrey holding onto his back. It appears that they fell momentarily on the steps and then the intruder ran toward the parking lot with Mrs. Mowrey still clinging to his back. Upon reaching the parking lot he struck her in the jaw, hard enough to crack a back tooth, and then ran from the lot. Mr. Kennedy who had entered the parking lot to aid Mrs. Mowrey saw the intruder as he ran from the lot down an alley.

The record indicates that the stairway to the parking lot was lighted and that it was light enough out-of-doors to see clearly. Mrs. Mowrey,

whose height is about 5 feet 11 inches, described the intruder as being about 6 feet 1 inch tall. She testified that he wore the maroon scarf about his face at all times, which interfered with her ability to clearly observe his features. She thought he wore a brown topcoat and a short brown jacket.

Mrs. Mowrey was unable to identify the driver who took her home but she did remember that his automobile was two-tone red and white, and appeared somewhat newer than her 1951 Ford. Defendant testified he owned a 1953 two-tone cream over red Lincoln. On the morning of April 28 when the intruder appeared in her apartment Mrs. Mowrey had $54 in her purse in cash from her recent paycheck. She discovered after the burglary that the intruder had taken all of it.

Mr. Kennedy's description of the burglar paralleled Mrs. Mowrey's as to physical appearance and dress. Mr. Kennedy identified defendant at the police lineup, at the preliminary hearing, and at the trial as the burglar. It appears that in Mr. Kennedy's identification he placed special reliance upon "two protruding bumps" in the back of defendant's head and the very short, crew-cut appearance of his hair.

The record indicates that considerable information relative to defendant's past was in the possession of the Minneapolis Police Department. Detective Captain William Mahnke, in charge of the burglary division, received the details of the burglary about 5:30 a. m. on April 28, from Sergeant Robert E. Madryga of the Minneapolis Police Department. Captain Mahnke also knew at the time that on February 4, 1962, in the early morning, a burglary occurred at 2427 Blaisdell, Apartment 12, Minneapolis, wherein a man entered the apartment by using keys which had been stolen from the same apartment the night before, took money from the victim's purse, and spent about an hour attempting to fondle the victim and making indecent proposals to her. He was also aware that on the same day, in the same building, but in a different apartment, a burglary occurred wherein a man entered, either by using a key or opening the door with a case knife, took money from the victim's purse, and told her that he had taken pictures of her in indecent poses while she was in bed. After these burglaries occurred, Captain Mahnke had searched police department files

and discovered that defendant had been arrested and subsequently charged with burglary and attempted rape in 1955 and during investigation of that charge had admitted involvement in 14 offenses wherein he had entered women's apartments, committed a larceny, and at times had attempted to converse with the victim and to make indecent proposals to her. At the trial defendant testified that he is 6 feet 2 inches tall; weighed about 220 pounds on April 28, 1962, and wore his hair crew-cut style. He admitted to having three prior felony convictions, namely, attempted rape, burglary in the third degree, and indecent assault. The first two convictions, although near in time, were separate offenses which were part of a series.

Captain Mahnke had also contacted Don Jones, a probation officer of the Department of Corrections, and described the two offenses occurring on February 4. Jones informed Captain Mahnke that the method of operation used in those two offenses was typical of defendant's activities in connection with previous offenses and that in his opinion defendant was at that time very capable of committing the offenses which occurred on February 4. On February 13, 1962, defendant was interviewed at the burglary office of the Minneapolis Police Department in regard to the burglaries occurring on February 4. He admitted that he was well acquainted with the area involved and that he had been within a few blocks of where the burglaries occurred at 3 a. m. February 3. He was unable to account for his activities after 3 a. m. One of the victims had been stationed in an adjoining room during this interview and had listened to defendant's voice and observed his appearance. While she stated that his voice was similar to that of her assailant, and that his physical appearance answered her description even to the type of overshoes he wore, she could not make an outright positive identification because she had not clearly seen his features. She had previously described him, however, as over 6 feet tall, well built, weighing 200 to 220 pounds, and 35 years of age.

Another burglary had occurred in south Minneapolis on February 15, 1962, at the apartment of two female victims, Rita Johnson and Judy Kanten. The two girls described the burglar as a white man,

about 6 feet 1 inch tall, wearing a nylon stocking pulled over his eyes and nose and appearing to have blond hair, cut short. Photographs were shown each of the girls who independently selected defendant's photograph as being the one similar in appearance to the burglar. Again positive identification was not forthcoming because of the stocking covering the assailant's face, but both girls viewed defendant and unhesitatingly stated that he "greatly resembled" the burglar at their apartment.

At the time in question Captain Mahnke was also aware of four other burglaries of girls' apartments occurring in south Minneapolis during March and April 1962, and in each of these except one, the burglar talked to the victim while she was in bed, attempted to commit indecent acts upon her, or made indecent proposals to her. None of those victims was able to identify her assailant, although one of them noted he wore his hair cut very short.

It also appears from the record that on April 25, three days before the crime here involved occurred, Sergeant Madryga reported to Captain Mahnke that he and other officers had observed defendant in the early morning hours, seated in a 1953 Lincoln automobile parked near a car containing a man and two girls. When the officers asked defendant why he had chosen this location at that hour of the morning he answered that he was looking for a friend but he was unable to give the friend's address.

After being alerted to the crime in the case at bar, Captain Mahnke instructed Sergeant Madryga to go to the defendant's residence at 3800 Columbus Avenue, Minneapolis, to ascertain whether a 1953 two-tone cream over red Lincoln automobile was parked in the vicinity. Twenty minutes later Sergeant Madryga reported back that it was not. Captain Mahnke then placed the area under surveillance and told Madryga to instruct his officers to arrest defendant if he showed up and to search his car.

The record is clear that, based upon the information detailed above, Captain Mahnke believed that defendant was the burglar who had entered Mrs. Mowrey's apartment. At about 7:40 a. m. the same morning, April 28, 1962, he briefed Detectives Wallace Johnson and

Donald Arneson on the burglary and the burglar, furnishing them with a description of the automobile defendant was believed to be driving, and instructed them to proceed to defendant's address to relieve the detectives then there, to await his arrival, and to arrest him. Detective Johnson, a police officer with 14 years' experience, was previously acquainted with defendant's appearance and also knew that defendant was a suspect in past burglaries involving a similar mode of operation.

Detectives Johnson and Arneson proceeded to 3800 Columbus Avenue South to await defendant's arrival. While parked there in a police car they finally saw the 1953 Lincoln drive past without stopping. After they verified the license number and obtained assistance, the two detectives arrested defendant in the 4700 block on Bloomington Avenue.

At the time of defendant's arrest he was wearing a dark brown suit "with a darker brown undertone" which had no buttons on either the front or the cuffs. It was, of course, surmised that this condition had some connection with the scuffle that took place in Mrs. Mowrey's apartment and the parking lot at the time of the burglary. Defendant claimed at the trial that he had accidentally ripped off the center button of his suit coat earlier that morning and in anger had ripped off the remainder. The left sleeve of the coat he wore was also in a "puckered condition" while the seam was ripped on the right shoulder. His topcoat, made of a tweedy material with either a black or darker brown design in it, was lying on the front seat of defendant's automobile at the time of his arrest.

The police were called immediately after the occurrence at Mrs. Mowrey's apartment and arrived shortly afterward, being followed soon thereafter by Captain Mahnke. Mrs. Mowrey, Captain Mahnke, and the other officers present then examined the parking lot. Following the path taken earlier by the burglar, they discovered a broken button on it. The button appeared to be a brown button from a man's suit coat and had been smashed into four pieces. It was about the size of a dime and had brownish-colored threads ½-inch long attached to it. This broken button was introduced in evidence at the trial.

An analyst from the laboratory of the State Crime Bureau testified that he performed microscopic examinations of this button, a cuff button taken from defendant's automobile, and defendant's suit coat. The analyst explained that a loose thread which had once fastened a cuff button to the left sleeve of the suit coat—though no buttons remained on the coat when he examined it—"was indistinguishable" from the thread which was attached to one of the fragments of the broken button. He also testified that the two buttons were indistinguishable except that a variation in diameter led to the conclusion that the larger button came from the coat lapel. It was the opinion of the analyst that the button fragments which were submitted to the laboratory had originally been on the suit coat defendant was wearing when arrested or one identical to it.

Both in his motion for a new trial and on this appeal defendant assigned as error the court's denial of his motion for a mistrial following the reception of the testimony of Judy Kanten and Rita Johnson, who had discovered an intruder in their apartment on February 15, 1962. In brief, their testimony was to the effect that they shared an apartment at 2700 Garfield Avenue and shortly after arriving home about 5:30 p. m. February 15 discovered an intruder hiding in the apartment. Upon being discovered he ran out into the living room and locked the door to the hallway. He wore a woman's stocking over his face and had a gun. He ordered the girls to go into their bedroom and then left, after which they reported the incident to the caretaker. The intruder had remained in the apartment about 5 minutes after the girls' arrival. They described him as tall, of medium build, and with light hair, and were quite explicit as to his manner of dress. At the trial Miss Kanten identified defendant as the man she believed entered her apartment. About 6 weeks after the incident she had identified defendant at a police lineup as the intruder, but not positively. She based her identification then partially on the way defendant walked and talked. Miss Johnson also testified that she believed defendant was the intruder.

1. The principal issue on this appeal is whether Detective Johnson under the direction of Captain Mahnke, on the basis of their knowledge and experience gained as officers of the burglary division and

their knowledge relative to the defendant's known criminal proclivities, gained through investigation of prior similar burglaries, had probable cause to arrest defendant without a warrant for the commission of the burglary occurring April 28, 1962.

Defendant makes the claim on appeal that Detective Johnson had only a "mere suspicion" that he committed the crime at the time of the arrest. The state, however, contends that Detective Johnson, then under orders from Captain Mahnke, a seasoned police officer and reliable informant, acted as one would expect a prudent police officer in the line of duty to act at the scene of the arrest.

Unreasonable searches and seizures are prohibited by U. S. Const. Amend. IV, which provides:

"The right of the people to be secure in their persons, houses, papers and effects, against *unreasonable searches and seizures,* shall not be violated, and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." (Italics supplied.)

Minn. Const. art. 1, § 10, contains practically identical language.

The statutory authority of a peace officer to arrest a person without a warrant is found in Minn. St. 629.34, which provides in part:

"A peace officer may, without warrant, arrest a person:

"(1)   For a public offense committed or attempted in his presence;

"(2)   When the person arrested has committed a felony, although not in his presence;

"(3)   When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it."

Defendant contends that no probable cause existed either for his arrest without a warrant or for the search and seizure which followed his arrest, and that his motion to suppress any evidence obtained as a result of the search and seizure should have been granted and the objects seized should have been returned. He cites Mapp v. Ohio, 367 U. S. 643, 655, 81 S. Ct. 1684, 1691, 6 L. ed. (2d) 1081, 1090, 84 A. L. R. (2d) 933, 942, rehearing denied, 368 U. S. 871, 82 S. Ct. 23, 7 L. ed. (2d) 72, which held that "all evidence obtained

by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court."

It is clear that § 629.34(3) allows a police officer to arrest a suspect without an arrest warrant when a felony has occurred, and he has reasonable cause for believing that the suspect committed it. We have held that "reasonable cause" here and the "probable cause" required by the Fourth Amendment are synonymous. State v. Harris, 265 Minn. 260, 121 N. W. (2d) 327.

2.   The United States Supreme Court has said that in dealing with probable cause—

"* * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved." Brinegar v. United States, 338 U. S. 160, 175, 69 S. Ct. 1302, 1310, 93 L. ed. 1879, 1890.

Probable cause for an arrest has been defined to be a "reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty." Garske v. United States (8 Cir.) 1 F. (2d) 620, 623. See, also, People v. Ingle, 53 Cal. (2d) 407, 412, 2 Cal. Rptr. 14, 17, 348 P. (2d) 577, 580.

Each case, however, must be decided on its own facts and circumstances and is not subject to some set formula as a guide by which to judge the reasonableness of the arrest in issue. The question to be answered is whether an officer in the particular circumstances, conditioned by his observations and information, and guided by the whole of his police experience, reasonably could have believed that a crime had been committed by the person to be arrested. Go-Bart Importing Co. v. United States, 282 U. S. 344, 357, 51 S. Ct. 153, 158, 75 L. ed. 374, 382; Jackson v. United States, 112 App. D. C. 260, 262, 302 F. (2d) 194, 196; Bell v. United States, 102 App. D. C. 383, 254 F. (2d) 82, certiorari denied, 358 U. S. 885, 79 S. Ct. 126, 3 L. ed. (2d) 113.

3.   This court, speaking through Mr. Justice Murphy, said in the

recent case of State ex rel. Branchaud v. Hedman, 269 Minn. 375, 378, 130 N. W. (2d) 628, 630:

"In the argument before this court it appears to be the claim of defendant that the evidence used against him was the product of an exploratory search without probable cause in violation of his rights under the Fourth and Fourteenth Amendments. It seems to be further urged that since Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. ed. (2d) 1081, police officers are not permitted to accost a suspicious character on a public street for questioning. While the Mapp case and numerous decisions recently handed down by the United States Supreme Court clearly establish that under state and Federal procedures citizens are entitled to uniform protection from unreasonable searches and seizures, we do not understand that these decisions have gone so far as to require or suggest that state police officers follow precise procedures in making arrests, searches, and seizures. The Fourth Amendment protects the individual only from 'unreasonable' searches and seizures; and whether a search and seizure is 'unreasonable' must depend upon the particular facts of each case."

Police officers are in a very real sense the guardians of the public peace in the very localities where people ply their trades, practice their vocations, and live and maintain their homes. In the course of their work such officers are required to be alert for suspicious circumstances and to be fearless in investigation whenever such circumstances indicate its necessity, although they must act within constitutional limits. See, Frye v. United States (9 Cir.) 315 F. (2d) 491, 494; People v. Rivera, 14 N. Y. (2d) 441, 252 N. Y. S. (2d) 458, 201 N. E. (2d) 32.

We said in State v. Harris, *supra,* that to require a high degree of technical competence on the part of the average police officer, i. e., that expected of the prosecutor, would be an unfair and unreasonable standard, citing with approval Brinegar v. United States, 338 U. S. 160, 176, 69 S. Ct. 1302, 1311, 93 L. ed. 1879, 1890, wherein the Supreme Court of the United States said:

"These long-prevailing standards seek to safeguard citizens from

rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. *The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.*" (Italics supplied.)

4. Since the police deal with probabilities, not legal proof, in deciding whether to arrest without a warrant, this means, according to Jackson v. United States, 112 App. D. C. 260, 263, 302 F. (2d) 194, 197:

"* * * The police are entitled to rely upon hearsay which would be inadmissible in judicial proceedings, and upon various other factors which would not be admissible in evidence against an accused on trial. Rumor, gossip, common conversation, general reputation, hearsay, all these may well go into the police evaluation of the total situation which confronts them."

The arresting officer need not have in hand evidence which would suffice to convict. Wong Sun v. United States, 371 U. S. 471, 83 S. Ct. 407, 9 L. ed. (2d) 441. The rule of probable cause, tempered by reason and a spirit of fair play, when applied to the facts at hand, furnishes the only practical working basis upon which the police officer can operate in evaluating the situations which confront him in the law-enforcement field.

5-6. Whether the search is reasonable is to be determined by the trial court in the first instance. Mapp v. Ohio, *supra.* In this case the trial court twice held against defendant on his motion to suppress the evidence, based no doubt upon a judicial determination, considering all the factors involved, that the officers had probable cause to make the arrest. State v. Harris, *supra.*

The courts appear to have no difficulty in finding reasonable and probable cause where the arresting officer has personal knowledge as well as knowledge given him by reliable informants leading him to believe that the crime has been committed by the person arrested. Of course, where the officer makes an arrest without any knowledge of his own as to the commission of the crime, except such as comes from an informant whom he does not know to be reliable, the courts have consistently held that there are no reasonable grounds for the arrest.

We conclude upon the record here that the arresting officers had probable cause to arrest defendant without a warrant. A reasonable man, experienced as a detective and police officer, acting on the information at hand, could sensibly conclude that defendant in all probability committed the burglary and made the indecent proposals to Mrs. Mowrey. For other cases where the facts were found to justify an arrest without a warrant, see Ker v. California, 374 U. S. 23, 83 S. Ct. 1623, 10 L. ed. (2d) 726; Kuhl v. United States (9 Cir.) 322 F. (2d) 582; Mares v. United States (10 Cir.) 319 F. (2d) 71; Johnson v. United States (5 Cir.) 328 F. (2d) 883; United States v. Zimple (7 Cir.) 318 F. (2d) 676. Of course, suspicion and rumor alone fall short of probable cause, as was held in Henry v. United States, 361 U. S. 98, 80 S. Ct. 168, 4 L. ed. (2d) 134. But heavy and almost exclusive reliance on hearsay has never destroyed the validity of an arrest without a warrant. Draper v. United States, 358 U. S. 307, 79 S. Ct. 329, 3 L. ed. (2d) 327.

7-8. As we have already pointed out, the Fourth Amendment does not condemn all searches. It condemns only unreasonable searches and seizures. Harris v. United States, 331 U. S. 145, 67 S. Ct. 1098, 91 L. ed. 1399; Draper v. United States, *supra*; State v. Pluth, 157 Minn. 145, 195 N. W. 789.

It was held in Preston v. United States, 376 U. S. 364, 84 S. Ct. 881, 11 L. ed. (2d) 777, that when a person is lawfully arrested police have the right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or fruits of the crime or implements used to commit the crime; and that the right of search and seizure without a search warrant when a person is lawfully arrested

extends to things under that person's immediate control and, to an extent depending upon the circumstances of the case, to the place where he is arrested.

The rules governing the search of an automobile and of a home are substantially different, due to the mobility of the former. Carroll v. United States, 267 U. S. 132, 153, 45 S. Ct. 280, 285, 69 L. ed. 543, 551. Police officers have the right to search an automobile under the immediate control of the accused at the time of his arrest when the search is incident to a lawful arrest based upon probable cause. State v. Harris, *supra*; Brinegar v. United States, *supra*; Carroll v. United States, *supra*.

Defendant contends, however, that the court erred in failing to suppress the button taken from his automobile. This button was removed from the car at the Bryant Avenue Police Station 40 minutes after defendant's arrest and while he was either being transported to the downtown police station or was already incarcerated therein. In support of his contention that this evidence was illegally obtained, defendant cites the Preston case, in which the court said (376 U. S. 367, 84 S. Ct. 883, 11 L. ed. [2d] 780):

"* * * Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest."

It is clear that the rule enunciated in that case prohibited the search of defendant's automobile at the police station and the seizure of the button found then. Mapp v. Ohio, *supra,* and Ker v. California, *supra,* compel us to follow the Federal pronouncements in this area. Therefore, we hold that the trial court erred in failing to grant defendant's motion to suppress the button.

However, although the trial court erred, the error is not sufficient for reversal. The dominant evidence in the state's case was the thread which was attached to the button found near the scene of the crime, for the crime laboratory analyst testified that this thread was indistinguishable from a thread found on defendant's coat sleeve, which had at one time fastened a button to it. The introduction of the illegally

seized button added little to the state's case, and since it was merely cumulative evidence its admission was not reversible error.[1]

9. Defendant contends that the trial court erred when, over his objection, it admitted the testimony of Miss Kanten and Miss Johnson concerning the presence of an intruder in their apartment. Their testimony was admitted upon the theory that the intruder was the defendant and that the testimony, with other evidence, was illustrative of a plan or scheme in which defendant was then, or had at previous times, been engaged.

In State v. Wofford, 262 Minn. 112, 117, 114 N. W. (2d) 267, 271, this court said:

"It is well established that evidence that the accused has committed another crime unrelated and unconnected with the one for which he is on trial is inadmissible since it is not competent to prove one crime by proving another."

This rule, however, has certain exceptions. State v. Sweeney, 180 Minn. 450, 455, 231 N. W. 225, 227, 73 A. L. R. 380; State v. Elli, 267 Minn. 185, 125 N. W. (2d) 738. One of these exceptions is that evidence of other crimes is admissible when it tends to establish a common scheme or plan. In the Elli case we said (267 Minn. 188, 125 N. W. [2d] 740):

"* * * The reason for the exception is that such facts are of particular relevance. If they tend to show defendant was involved in a plan or scheme, his guilt of a crime according to that scheme may well be inferred."

The determination of whether other independent criminal acts are so closely connected with the crime as to be admissible is in the first instance a matter resting largely within the discretion of the trial court, and ordinarily there will be no reversal unless there is a clear abuse

---

[1]State v. Palmersten, 210 Minn. 476, 299 N. W. 669; State v. Yurkiewicz, 212 Minn. 208, 3 N. W. (2d) 775; State v. Johnson, 243 Minn. 296, 67 N. W. (2d) 639; Fahy v. Connecticut, 375 U. S. 85, 84 S. Ct. 229, 11 L. ed. (2d) 171 (where the minority approves of the doctrine and the majority does not disapprove of it).

of discretion. State v. DePauw, 246 Minn. 91, 74 N. W. (2d) 297. We conclude upon the record that the trial court did not abuse its discretion in ruling as it did.

10-11. The state contends that reception of the testimony of Miss Kanten and Miss Johnson was proper also as relevant to identifying the person who committed the burglary in Mrs. Mowrey's apartment. It is the rule that where the identity of the accused is not definitely connected with the offense for which he is on trial, evidence of other offenses may be introduced to connect and identify him with that one, and where the sole issue in a case is the identity of defendant, the evidence on that issue may be properly permitted to take a wide range to the extent that, in a measure, the rigid rules of evidence will be relaxed. 20 Am. Jur., Evidence, § 312.

"In general, evidence of an independent offense by the accused is admissible to prove his identity as the perpetrator of the crime charged; and proper evidence so to identify him is not inadmissible because it tends to prove him guilty of another crime." 22A C. J. S., Criminal Law, § 684.

See, also, Bateman v. State, 81 Tex. Cr. 73, 193 S. W. 666; Jenkins v. Commonwealth, 167 Ky. 544, 180 S. W. 961.

We conclude, therefore, that the trial court's rulings on the admissibility of the evidence discussed herein were either proper or failed to prejudice defendant and that there is ample proof to sustain the judgment of conviction.

Affirmed.