## STATE v. JOSEPH HARRISON.

156 N. W. (2d) 763.

February 23, 1968—No. 40,361.

*Donald G. Campbell,* for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *David C. Weinberg,* Assistant County Attorney, for respondent.

NELSON, JUSTICE.

Appeal from a judgment of conviction entered pursuant to finding defendant, Joseph Harrison, guilty of aggravated assault in violation of Minn. St. 609.225, subd. 2.

The facts upon which the jury found defendant guilty are: On August 4, 1965, at about 3:15 a. m., Officer Gaylord Gladwin of the Narcotics Squad, Minneapolis Police Department, was driving south on Nicollet Avenue in Minneapolis. Officer Gladwin was at that time dressed in civilian clothes and driving a private car. As he approached the middle of the block on Nicollet between 12th and 13th Streets, he observed a 1955 or 1957 red and white Pontiac traveling in the opposite direction. The car was occupied by two men, the driver, a light-complexioned Negro male with long hair, and a rider, a white male with blond hair. The two cars passed within 3 or 4 feet of each other and Officer Gladwin saw the driver whom he later identified as defendant. When the cars passed, both were traveling at relatively slow speeds. Officer Gladwin first clearly saw the features of the driver, defendant herein, when he was at a point about 10 or 15 feet from the vehicle. At the time in question, there was daytime lighting in the area from fluorescent street lights.

Officer Gladwin also observed that defendant's vehicle was trail-

ing a young lady walking down the sidewalk and was moving parallel to her. When the girl and defendant's vehicle reached the corner of 12th and Nicollet and turned west, Officer Gladwin drove to 13th and Nicollet, quickly circled the block, and was parked in the middle of the block when defendant's car and the girl again came into view. The occupants of the Pontiac had not changed positions from when Officer Gladwin first saw them on Nicollet Avenue. With his lights out, Officer Gladwin followed them down 12th Street to the intersection of 12th and Yale Place, where the girl started to cross the street. At that time defendant's car was driven into the crosswalk, preventing the girl from crossing and forcing her to walk out around the vehicle to get across the street. Upon crossing the street, she began to run. At that time, Officer Gladwin's car was about 45 yards away from defendant's car and there was sufficient lighting to see quite well.

As the girl began to run down the street, Officer Gladwin heard a crack sound which appeared to be the noise of a small-caliber weapon. He also noticed at the time what appeared to be a rifle extending out the right side of defendant's car. After hearing the crack sound, Officer Gladwin focused on defendant's vehicle and, looking through the window, he saw the weapon being brought in the window by the passenger, being handed to defendant, and then being extended out of the left side of the vehicle by defendant.

The weapon was turned in the direction of Officer Gladwin's car, and he heard a second crack sound. Just prior to the sound, Officer Gladwin observed a small portion of defendant's left arm and hand extending out of the window holding the weapon. The position of the hands and the sound of the crack indicated to Officer Gladwin that the weapon was a rifle as opposed to a pistol and was of a small caliber. Based on his prior observations, Officer Gladwin knew that defendant was the person who fired the shot at him. When the second shot was fired, Officer Gladwin was looking through the windows of his car at the defendant's vehicle, and there were no objects or protrusions within his line of sight.

After the second shot had been fired, Officer Gladwin called the

police dispatcher on a portable radio and reported the incident. While he was so engaged, defendant's vehicle started to leave the scene and Officer Gladwin gave chase, but defendant successfully eluded him.

Later the same morning when Officer Gladwin finished his tour of duty, he recorded this incident in the daily motor patrol log. Subsequently, he made out an offense report relating the details of the incident, which he also related to Detectives Eugene Wilson and Russell Krueger. Between August 4 and August 6, 1965, a memorandum was put out by the Minneapolis Police Department stating in substance that the occupants of a certain pink and white 1958 or 1959 Pontiac hardtop, who were either Negroes or Indians, or one white male, shot at a police officer and were wanted for suspicion of assault. Subsequently, on August 10, 1965, a second memorandum was issued by the police department regarding the same incident. That memorandum in substance identified defendant as Joseph Harrison, gave the license number of the automobile, the description of the automobile, two addresses where defendant might possibly be, and stated that defendant was suspected of assaulting Officer Gladwin.

The second memorandum was read by Police Sergeant Leonard Brucciani on August 14, 1965, at the 11:40 p. m. roll call of the night shift. That same night, Sergeant Brucciani and his partner, Officer Arthur L. Elsner, while transporting some people in the Minneapolis loop, crossed the intersection of 11th Street and Marquette Avenue going north at approximately 2:45 a. m. They observed a car on their right waiting for a semaphore—a pink and white 1957 Pontiac. The officers made a "U-turn" and came back and followed the car as it turned left off 11th Street onto Nicollet Avenue going south. The officers radioed for other police cars to join them and to assist in apprehending this vehicle. They then followed the car to Grant and Nicollet where it made a turn and went west to LaSalle Avenue, then south on LaSalle. Finally as other police cars joined them the officers stopped the vehicle at approximately 1525 LaSalle Avenue.

Sergeant Brucciani alighted from the squad car and walked to the passenger's side of the vehicle, while two other uniformed officers approached the driver's side. The officers asked the driver, defendant

herein, for his driver's license, at which time defendant stepped out of the car. As he did so, the interior light of the car came on, and at the same time Sergeant Brucciani put his flashlight in the car and observed something black sticking out under the seat on the passenger's side. Upon seeing this black object, Officer Brucciani exclaimed, "What's this?" and the passenger opened the car door. The officer then reached down and picked up the object that extended from the seat. At that time the passenger turned in his seat, and as he did so, Sergeant Brucciani noticed the butt of an automatic pistol sticking out from the cushion where the back rest of the seat and the cushion met. He reached in and pulled the pistol out of the car. Sergeant Brucciani identified the driver as defendant and the passenger as Duane Edward Madson, whose name later turned out to be Duane Edward Mampel. At that time Sergeant Brucciani took the passenger in custody, handcuffed him, and gave orders to the other officers to do the same with defendant. After both men were handcuffed, they were searched and taken to the squad cars of the respective officers.

After the passenger was secured in Brucciani's car, he went over to the squad car in which defendant had been placed and told defendant he was under arrest for a traffic violation and also for suspicion of assault and that his car was going to be towed in and searched. After speaking with defendant, Brucciani took the key from the ignition and opened the trunk of the car. Subsequently, the car was searched and the officers found shotgun shells in the glove compartment, a guncase in the back seat, and in the trunk a .22-caliber rifle, a cigar box full of .22 rifle shells, and a number of bow and arrow sets. All of these items were initialed and inventoried on the spot.

When Brucciani returned to the squad car he was informed by his partner, Officer Elsner, that the passenger wanted to speak to him but that he did not want to say anything until they had left the scene. They then left and as they were driving to the courthouse the passenger informed Brucciani that defendant had confided to him that at an earlier date defendant had fired a rifle at a man on 13th and Nicollet, but he did not know the exact location.

A preliminary hearing was had in municipal court at the conclusion

of which defendant was bound over to the district court. Defendant was charged there with the crime of aggravated assault, and subsequently arraigned and plead not guilty.

Prior to trial defendant filed a motion to suppress certain physical evidence seized from him at the time of his arrest on the grounds that there was an illegal search and seizure. A hearing was had on the motion, and it was denied. The court ruled, however, that the evidence seized at the time of arrest would be inadmissible at the trial for lack of sufficient foundation. Defendant's trial before a jury resulted in a verdict of guilty.

■ Defendant contends on this appeal that since his arrest was illegal, the search of his automobile incidental thereto was illegal and therefore the testimony of Duane Mampel was inadmissible at the trial. Upon this claim he predicates the conclusion that the evidence does not support the verdict because without the testimony of Mampel the jury could not have reasonably found defendant guilty of the offense charged.

The state contends that none of these propositions, let alone the conclusion drawn therefrom, is supportable in fact or in law; that defendant's allegations have been neatly constructed upon the foundation of a claimed illegal arrest; that he has built his case in that manner to support his conclusion that the evidence was insufficient to support the jury's verdict of guilty. The state argues that the legality of defendant's arrest is fully supported, both in fact and in law, and that therefore defendant's conclusion regarding the sufficiency of the evidence must fall.

Minn. St. 629.34 provides in part:

"A peace officer may, without warrant, arrest a person:

\* \* \* \* \*

"(3) When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it; or

"(4) Upon a charge made upon reasonable cause of the commission of a felony by the person arrested."

This court has said:

"The constitutional mandate requiring 'probable cause' and the statutory standard of 'reasonable cause' are synonymous." State v. Harris, 265 Minn. 260, 263, 121 N. W. (2d) 327, 330, certiorari denied, 375 U. S. 867, 84 S. Ct. 141, 11 L. ed. (2d) 94; State v. Sorenson, 270 Minn. 186, 134 N. W. (2d) 115; State v. Purdy, 278 Minn. 133, 153 N. W. (2d) 254.

The constitutional test for probable cause was set down in Brinegar v. United States, 338 U. S. 160, 175, 69 S. Ct. 1302, 1310, 93 L. ed. 1879, 1890, where the United States Supreme Court said:

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

" 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' McCarthy v. De Armit, 99 Pa. St. 63, 69."

See, Carroll v. United States, 267 U. S. 132, 45 S. Ct. 280, 69 L. ed. 543, 39 A. L. R. 790; Beck v. Ohio, 379 U. S. 89, 85 S. Ct. 223, 13 L. ed. (2d) 142; Lee v. United States (8 Cir.) 363 F. (2d) 469.

■ At the conclusion of the hearing on defendant's motion to suppress, the trial court noted that the first memorandum described the vehicle by color, name, and year, generally described the occupants, and noted that a police officer was shot at; that the second memorandum named the defendant more specifically, designated the year of the vehicle, repeated the colors of the vehicle, provided a license number therefor, and stated that the car was involved in a shooting wherein Officer Gladwin was shot at. The court thereupon denied defendant's motion to suppress certain evidence on the grounds of illegal search and seizure and found the search and seizure legal and proper under all of the circumstances. The trial court apparently found that the memoranda read by Sergeant Brucciani prior to defendant's apprehension and arrest provided sufficient facts and circumstances within his knowledge and of which he had reasonably trust-

worthy information to warrant him in the belief that an offense had been committed by defendant. Less information was held to fully support a lawful arrest and search in Rodgers v. United States (8 Cir.) 362 F. (2d) 358, and the description of the car and defendant in the instant case is as comprehensive as that presented in State v. Sorenson, *supra,* wherein this court found ample probable cause to support an arrest.

We conclude that in the light of the foregoing defendant's arrest was based upon probable cause, was within the statutory prescription, and therefore constituted a lawful arrest.

■ We also conclude that the trial court committed no error in denying defendant's motion to suppress evidence seized from his automobile at the time of his arrest. The arrest of defendant being based upon probable cause and being thus legal, the law regarding the propriety and legality of the search subsequent and incidental thereto leaves no question but that such search was legal. See Preston v. United States, 376 U. S. 364, 367, 84 S. Ct. 881, 883, 11 L. ed. (2d) 777, 780, wherein the Supreme Court of the United States made the following statement in regard to a search incidental to a lawful arrest:

"* * * Unquestionably, when a person is lawfully arrested, the police have the right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of or implements used to commit the crime. Weeks v. United States, 232 U. S. 383, 392 [34 S. Ct. 341, 344, 58 L. ed. 652]; Agnello v. United States, 269 U. S. 20, 30 [46 S. Ct. 4, 5, 70 L. ed. 145]. This right to search and seize without a search warrant extends to things under the accused's immediate control, Carroll v. United States, 267 U. S. [132], at 158, [45 S. Ct. 280, 287, 69 L. ed. 543, 553] * * *."

The rule of the Preston case has been cited by this court in State v. Holmes, 273 Minn. 223, 140 N. W. (2d) 610; State v. Clifford, 273 Minn. 249, 141 N. W. (2d) 124; and most recently in State v. Dill, 277 Minn. 40, 151 N. W. (2d) 413.

■ The state contends that the issue of the admissibility of the

testimony of Mampel is not properly before this court as no motion to suppress was made prior to trial nor was there any objection in regard thereto made during the trial. We agree with the state's contention in this respect. The admissibility of evidence cannot be questioned for the first time on appeal. State v. Taylor, 270 Minn. 333, 133 N. W. (2d) 828; State v. Ferraro, 277 Minn. 204, 152 N. W. (2d) 183. Moreover, as the state has clearly pointed out, even had this issue been properly raised at the trial below the finding that there was no illegal search and seizure in this case in regard to the other evidence seized at the time of defendant's arrest would likewise have established that this evidence was admissible.

■ It might be well to point out that in reviewing the sufficiencies of the evidence we do not try the facts anew; that our responsibility extends no further than to make a painstaking review of the record to determine whether the evidence, direct and circumstantial, viewed most favorably to support a finding of guilt, was sufficient to permit the jurors to reach the conclusion which they did. State v. Kline, 266 Minn. 372, 124 N. W. (2d) 416, certiorari denied, 376 U. S. 962, 84 S. Ct. 1124, 11 L. ed. (2d) 980; State v. Norgaard, 272 Minn. 48, 136 N. W. (2d) 628; Cady v. United States, 54 App. D. C. 10, 293 F. 829.

We reach the conclusion that the evidence clearly supports the jury's verdict of guilty.

Affirmed.