# STATE v. KENNETH D. VALSTAD.

165 N. W. (2d) 19.

January 24, 1969—No. 41181.

*C. Paul Jones,* State Public Defender, and *Robert E. Oliphant,* Assistant State Public Defender, for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Frank T. Gallagher, JJ.

NELSON, JUSTICE.

Appeal from a judgment of conviction of possessing burglary tools, proscribed by Minn. St. 609.59, which provides:

"Whoever has in his possession any device, explosive, or other instrumentality with intent to use or permit the use of the same to commit burglary may be sentenced to imprisonment for not more than three years or to payment of a fine of not more than $3,000, or both."

On March 17, 1967, Patrolman Wallace Cecil, Minneapolis Police Department, talked to Third Precinct Officer Bridgeman, who said that on the previous evening his partner and he had received a call to go to approximately 49th Street and 17th Avenue to check several men in a car. The automobile appeared to them to be a 1955 to 1957 black Cadillac containing a license with a 3 and a 4 in the last digits. The automobile "took off" when the police approached. When the officers "lost the automobile in the chase," they went back to the original point where they started the chase and found numerous checks and receipts from a Masonic lodge on 52nd Street and Bloomington Avenue. Upon investigation the patrolmen found that the lodge had been burglarized.

On March 22, 1967, at about 11:40 p. m., Officer Cecil and his partner, Patrolman Richard Lorenson, reported for duty at the Third Precinct Station in South Minneapolis. Before leaving in their squad car the two officers studied a department memorandum of that day which read as follows:

"Subject BURGLARY OF MASONIC LODGE, 5149 Bloomington * * *

"During the nighttime 3-16/17-67 a burglary occurred at the above listed lodge. The safe was peeled.

"Squad 330, Bridgeman & Ahrens saw the car containing the fleeing burglars and gave chase. They lost the car at approx. 12th Ave. So. and 50th St.

"The automobile is described as a 1955 to 1957 Cadillac, black in color, very dirty. The officers believe that of the last three numbers on the license plate there was a '3' and a '4'—the last three numbers may have been '344.'

"The auto contained at least three people in the car. They are certain that one of the three was a Negro but did not get a good look at the others.

"THIS MEMO IS FOR GENERAL INFORMATION ONLY * * * THIS MEMO IS NOT AUTHORITY TO MAKE AN ARREST."

About 2:30 a. m. the morning of March 23, 1967, Officers Cecil and Lorenson were "patrolling in the squad" headed north "in the vicinity of Chicago Avenue and 43rd Street in the City of Minneapolis," when, as Officer Cecil related—

"* * * a car traveling south was coming at us with its high beams on and we blinked our lights and he turned his lights down, and we observed a dark model Cadillac and we took the license number and the last three digits were three four six. We made a 'U' turn and the defendant—or the car turned right on 44th Street and then north in the alley between 43rd and 44th Street. *Turned off his lights at a high rate of speed."* (Italics supplied.)

The officers followed down the alley at a high rate of speed. Defendant, driving without his lights, made a left turn out of the alley on 43rd Street, heading west, and by the time the officers got to the end of the alley they had lost him. Officer Cecil explained that he and his partner originally followed the Cadillac "to find out who the driver was, the occupant of the car, because we had previous information that a car of that type and—we had observed the license number and the numbers were in the license, we wanted to find out who was in the car."

The officers searched the area and a few minutes later saw the

Cadillac "traveling south on Chicago Avenue crossing the intersection of 42nd Street." The officers then "turned the Mars light on * * * and followed him to 43rd Street and he turned left or east and stopped half ways—about half way between the next intersection."

Officer Cecil approached the Cadillac while defendant voluntarily got out of his car and stood by the driver's side. Cecil asked defendant for his driver's license and the latter "patted his pockets" and said, "Could I use your flashlight? I believe it's in the glove compartment." Defendant took the flashlight, leaned in the car, looked in the glove compartment, and then came out and handed Cecil the flashlight with his left hand. As Cecil was putting it in his holder, Lorenson warned him, "Look out, Buck. He's got a gun." Defendant then took a .32-caliber pistol from his pocket and threw it into the back seat of the automobile. Officer Cecil thereupon told defendant to "put his hands on top of the car," and the officers then searched him.

While Officer Cecil, standing adjacent to the open door on the driver's side, was searching defendant, Officer Lorenson went to the other side of the Cadillac and looked into the car. He then noticed burglary tools in the front seat. The two officers saw, on the passenger side of the front seat, "[t]wo pinch bars, a pair of gloves, one or possibly two flashlights." Officer Cecil then handcuffed defendant and told him he was under arrest for investigation of burglary.

Other officers had arrived at the scene and a search of the Cadillac was conducted. Other burglary tools found in the car were more particularly described by Officer Ronald Cole, who participated in the search and prepared an inventory. They included two 12- to 14-inch pry bars, flashlights, a pair of gloves, and a long-shafted screwdriver. In addition, a search of the trunk yielded an adding machine, corporate seal, coffee can full of change, a rifle, ammunition, and a wide variety of burglary tools including pry bars, cotton gloves, screwdrivers, wire cutters, a sledge hammer, punches, files, wrenches, and nylon rope. In all, 88 items of burglary tools were found in the Cadillac.

While defendant was being transported to the city jail, the arresting officers "asked him his name but he wouldn't tell us anything." The officers

later learned that the title to the Cadillac was registered to a Wilhelmina Grunow.

Defendant testified in his own behalf and admitted to four prior burglary convictions. He claimed that on the date of the subject crime the real owner of the Cadillac was Richard Grunow. Defendant stated he obtained use of the automobile at 10:30 p. m. on the evening of March 22, 1967, and had the car in his possession until his arrest about 2:30 a. m. on March 23. Defendant denied fleeing from the police on the occasion of the first encounter. He insisted he was then driving 15 miles per hour and that the lights had gone out as he "was looking for the heater switch and my hand hit the light switch and they were out for approximately three or four seconds." Defendant insisted that he entered the alley to inspect a car that "possibly" was for sale. He conceded that when the arresting officer inquired as to what he was doing in the alley with his lights out he made no reply. He stated that he had been on a date until 2 a. m., but refused to identify the woman because she "is married and I don't want to have her dragged into court."

Defendant claimed he first became aware of the squad car when the officers "turned on their red lights." Defendant asserted that he threw the revolver into the back seat of his automobile. He denied ownership of any of the burglary tools. He did admit that he had no driver's license in his possession.

Following a Rasmussen hearing the trial court denied defendant's motion to suppress evidence, determining:

"That the police officers had probable cause for stopping the automobile that the defendant was operating on the early morning of March 23, 1967.

"That the arrest of defendant as he stood outside of his automobile after the police discovered in his possession a pistol, two crowbars and two flashlights, all in plain sight, was justified and lawful without a warrant in the light of the knowledge theretofore obtained from informers and investigators that a car of the description of the one defendant was driving was believed to have been involved in a burglary a few nights before.

"That the search and seizure of certain articles and tools in the automobile in question immediately following defendant's arrest was reasonable and lawful as an incident to his arrest.

"That the subsequent removal of such articles and tools from said car after it was towed to a police station did not render their possession by officers unlawful when such articles and tools originally observed at the time of the arrest were simply later removed and inventoried. State v. Grunau, [273 Minn. 315] 141 N. W. 2d 815.

\* \* \* \* \*

"That \* \* \* the property seized as an incident [to defendant's arrest] is not inadmissible upon constitutional grounds."

The testimony at the trial which followed was basically a repetition of that adduced at the Rasmussen hearing, both on the part of the state and and on the part of defendant. Both of the arresting officers were called as witnesses by the state for the purpose of laying a foundation for the reception in evidence of the revolver and all the burglary tools. The state offered to prove that between 6 p. m. March 22, 1967, and 2:30 a. m. March 23, 1967, the time when defendant was apprehended, a burglary was committed at a business establishment 12 blocks from 43rd Street and Chicago Avenue, where defendant was first spotted by police prior to his apprehension. The state's offer of proof included the fact that the adding machine and corporate seal recovered from the Cadillac trunk were taken in that burglary. This proof was offered to show that the burglary was part of a common scheme and plan of the defendant to use the tools as burglary tools. However, defendant's objection to the offer of proof was sustained, although the offer complied with the requirements of State v. Billstrom, 276 Minn. 174, 178, 149 N. W. (2d) 281, 284.[1]

Upon the evidence submitted, the jury found defendant guilty as charged. It is defendant's claim on this appeal, however, that there is no evidence in the record indicating any intent by him to use the tools found in the car for the proscribed purpose of committing a burglary and

---

[1] See, State v. Spreigl, 272 Minn. 488, 496, 139 N. W. (2d) 167, 173; State v. Hines, 270 Minn. 30, 133 N. W. (2d) 371; State v. Drews, 274 Minn. 426, 430, 144 N. W. (2d) 251, 254.

further that there is no evidence to link him to any past or future burglary other than those for which he has been convicted. The state argues that defendant possessed the burglary tools with the intent to use them to commit burglary and claims that the jury logically inferred from a variety of evidence that defendant possessed the tools with the requisite intent. It contends that the intent may be found in the nature of the items themselves—"Canvas gloves to avoid leaving fingerprints; an assortment of flashlights to facilitate working in the dark; wrenches, screwdrivers, and pry bars of all descriptions; and a sledge hammer—all appropriately adaptable to the breaking and entering which are the stuff of a burglary"; the placement of certain tools on the front seat of the car where they would be readily available; defendant's silence when asked why he drove through the alley with the lights off, his refusal to identify himself to the police, and his lack of any identifying data, such as a driver's license; his carrying and attempted disposal of the revolver; his attempt to evade the police; and the time—2:30 a. m.—when defendant drove his burglary tool-laden automobile. The state also contends that defendant's own "incredible" testimony served to confirm his guilt—his claim that at 2:30 a. m. he was driving down the alley for the purpose of locating an automobile "possibly" for sale; his insistence that he was driving only 10 or 15 miles per hour in the alley, which is clearly inconsistent with the fact that he escaped the police already in pursuit; and his denial that he was aware of the burglary tools lying on the front seat right next to him.

Defendant asserts also that he was arrested without probable cause and the items seized as a result of his arrest were inadmissible.

 It appears that the Illinois Supreme Court has on several occasions affirmed convictions of possession of burglary tools in fact situations similar to that at hand. In People v. Esposito, 18 Ill. (2d) 104, 163 N. E. (2d) 487, cited by the state, defendant's automobile was proceeding without illumination upon its rear license plate when it was stopped by a police officer at 5:30 a. m. The defendant was ordered from the car and his companion fled. Defendant upon request opened the glove compartment, revealing a revolver and a blackjack. An ensuing search of the trunk disclosed an array of tools and equipment, including an acetylene cutting

torch, a sledge hammer, crowbar, bolt cutter, punches, cold chisel, a radio capable of receiving police calls, and a screwdriver. The defendant, an unemployed laborer, claimed that he knew nothing about the tools, gun, and blackjack except that they belonged to his companion, whom he refused to name. His conviction for possession of burglary tools was affirmed, the Illinois court stating (18 Ill. [2d] 107, 163 N. E. [2d] 489):

"Defendant also contends that even if he did possess the tools there was no showing that he did so with a felonious intent. Again we must disagree. He was an unemployed laborer and had no apparent use for such equipment in his lawful employment or in the operation of his car. He was traveling upon a public street many miles from home at a late hour in the company of an individual who saw fit to flee when stopped by the police. His statements, first, that he knew nothing about the tools and then that they belonged to his companion were contradictory in nature. The presence of the police radio and weapons indicates an unlawful design * * * and defendant's refusal to identify his companion further weakens his claim of innocence. * * * It is our opinion that upon these facts the trial court properly inferred a felonious intent."

In another Illinois case, People v. Faginkrantz, 21 Ill. (2d) 75, 171 N. E. (2d) 5, the defendant at 4:30 a. m. parked in an alley with his motor and lights off. He was asked for identification by investigating police. The defendant claimed he had no evidence of ownership of the car because he had recently purchased it. His driver's license showed he did not live in the vicinity and he admitted he had served time for burglary. He claimed that he had just left a tavern and stopped in the alley to defecate. A search of his automobile trunk produced two air oxygen tanks, an air gauge, an acetylene gauge, a cutting torch, an axe, a hacksaw, and a sledge hammer. The defendant claimed that the state failed to prove that the possession was with intent to use the tools for a burglary. This was rejected by the Illinois court, which said (21 Ill. [2d] 80, 171 N. E. [2d] 8):

"* * * [T]he requisite intent must ordinarily be proved by circumstantial evidence. * * * The fact that the defendant was illegally parked

in an alley behind a plumbing supply firm at 4:30 A. M. with his motor and lights shut off, that he was far from home, that the police testified that, although they looked, they were unable to substantiate his asserted reason for being there, and that he had in his possession tools adapted to breaking and entering is, in our opinion, sufficient evidence upon which to base a finding of criminal intent."

Defendant on this appeal contends that there is no evidence to link him to any past or future burglary. The authorities would indicate that a conviction for possession of burglary tools requires no such evidence. In People v. Taranto, 2 Ill. (2d) 476, 482, 119 N. E. (2d) 221, 224, it was held:

"* * * The intent required by the statute is a general intent to use the tools for a criminal purpose, and it is not necessary to allege an intent to break into a particular building."

In People v. Esposito, *supra*, the same court said (18 Ill. [2d] 107, 163 N. E. [2d] 489):

"* * * The intent required, however, is a general intent to use the tools for a criminal purpose and may be inferred from the circumstances accompanying their possession."

Accord, State v. Watson (Mo.) 386 S. W. (2d) 24, 30; 12 C. J. S., Burglary, § 69.

■ Defendant asserts that this court has outlawed a presumption of intent to use tools burglariously from their mere possession, citing State v. Edwards, 269 Minn. 343, 130 N. W. (2d) 623. That case was concerned with the validity of the statutory presumption in Minn. St. 1961, § 621.13, and condemned the giving of an instruction that possession of burglary tools created a presumption of intent to use them to commit a burglary.[2] At the same time, this court observed (269 Minn. 348, 130 N. W. [2d] 626):

"To return to the precise issue before us, it may be said that if the

---

[2] See, also, State v. Higgin, 257 Minn. 46, 52, 99 N. W. (2d) 902, 907; State ex rel. Geiselhart v. Tahash, 274 Minn. 464, 467, 144 N. W. (2d) 354, 356.

court had omitted from its instructions that part of § 621.13 which authorizes the presumption and had also omitted the subsequent instructions emphasizing the effect of the presumption, the verdict could well be affirmed. Certainly there was *circumstantial evidence of the character and use of the articles found in the possession of defendant which would characterize them as burglarious instruments and from which inferences of intent to use them in the commission of a crime might be drawn.*" (Italics supplied.)

The trial court in the instant case specifically gave only the usual instructions on circumstantial evidence and correctly stated that a specific intent "can never be presumed." However, as we made clear in Edwards, an inference of intent to use burglarious tools in a criminal manner may be drawn from evidence of the character and use of such articles.

Defendant claims that the stopping of his automobile was in itself an arrest; that the only purpose of the police officers in stopping his car was to get a look at the driver; and that they had no probable cause at the time for making an arrest. Therefore, defendant argues, all items seized incident to that arrest should have been excluded from defendant's trial. The facts, however, are that the attention of the arresting officers was first drawn to defendant's automobile by a traffic violation when defendant's car approached their squad car from the opposite direction with its high-beam lights illuminated and that when defendant's automobile passed them the officers noted that it matched in make, approximate year, color, and certain of its license digits an automobile which had evaded other police officers after a recent burglary. The arresting officers also noted a taillight was not functioning. Pursuant to the department memorandum the patrolmen turned and followed.

Furthermore, defendant took evasive action, driving down an alley at 40 to 45 miles per hour with his headlights off. As Officer Cecil candidly testified, the original purpose of the patrolmen in pursuing the Cadillac was to ascertain the identity of the driver. His attempts to escape the following squad car further aroused the officers' suspicions and caused their ensuing investigation, an investigation that was both a right and a duty. State v. Fish, 280 Minn. 163, 159 N. W. (2d) 786. Accord, Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. ed. (2d) 889.

In the Fish case this court held that persons found under suspicious circumstances are not clothed with a right of privacy which prevents law-enforcement officers from inquiring as to their identity and actions. We said that permission to operate a motor vehicle upon public highways is a license or privilege, and a police officer may under authority of Minn. St. 171.08 demand of each operator of a motor vehicle that he display his license. It was held also that probable cause justifying an arrest without a warrant exists if the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed. In that case, while deputy sheriffs were waiting for a radio report as to defendant's status as a licensed driver, they learned that a tavern had probably been burglarized at about the time defendant was observed leaving the premises, an hour and a half after closing time. We held there was probable cause for the police officers to believe that defendant had committed the burglary and such probable cause warranted his arrest and a search of the automobile without a warrant. We said also (280 Minn. 167, 159 N. W. [2d] 789) that it is not only the right but the duty of police officers to investigate suspicious behavior, both to prevent crime and to apprehend offenders.[3]

While defendant claims the stopping of his automobile was in itself an arrest, we agree with the contention of the state that the arrest did not occur until the weapons search, at which time some of the burglary tools were spotted by the officers while standing outside and looking through the windows of the Cadillac. These observations of the tools in plain sight on the front seat of the car, the state contends, made the officers witnesses to a commission of a felony by defendant, since he then possessed the burglary tools, the very conduct which the statute declares to be an essential element of the crime charged. These tools constituted "an instru-

---

[3] See, State ex rel. Branchaud v. Hedman, 269 Minn. 375, 130 N. W. (2d) 628, certiorari dismissed, 381 U. S. 907, 85 S. Ct. 1456, 14 L. ed. (2d) 289; State v. Clifford, 273 Minn. 249, 141 N. W. (2d) 124; State v. Sorenson, 270 Minn. 186, 134 N. W. (2d) 115. See, also, United States v. Rabinowitz, 339 U. S. 56, 70 S. Ct. 430, 94 L. ed. 653; Brinegar v. United States, 338 U. S. 160, 69 S. Ct. 1302, 93 L. ed. 1879.

mentality of the crime"[4] and were, in fact, not the subject of a search.[5]

We think it clear from the whole of the evidence in this case that the arrest did not occur when defendant was first detained by the officers but that the factual circumstances which developed shortly thereafter established probable cause for arrest without a warrant and that a legal arrest followed, authorizing the incidental search of the automobile. Preston v. United States, 376 U. S. 364, 84 S. Ct. 881, 11 L. ed. (2d) 777; Carroll v. United States, 267 U. S. 132, 45 S. Ct. 280, 69 L. ed. 543, 39 A. L. R. 790; State v. Grunau, 273 Minn. 315, 141 N. W. (2d) 815; State ex rel. Ogg v. Tahash, 273 Minn. 187, 140 N. W. (2d) 692; State v. Sorenson, 270 Minn. 186, 134 N. W. (2d) 115; State v. Harris, 265 Minn. 260, 121 N. W. (2d) 327, certiorari denied, 375 U. S. 867, 84 S. Ct. 141, 11 L. ed. (2d) 94.

■ This court has said that the proof of intent to commit a crime in connection with proof of burglary must rest on a permissible inference from the facts proved. State v. Crosby, 277 Minn. 22, 25, 151 N. W. (2d) 297, 300. The same reasoning is applicable to the criminal intent accompanying the possession of burglary tools. The state clearly proved facts from which that intent was a permissible inference.

We are satisfied that defendant's arguments on appeal are without merit and the judgment of conviction should be affirmed.

Affirmed.

---

[4] State v. LaJeunesse, 280 Minn. 381, 385, 159 N. W. (2d) 261, 264.

[5] State v. Huffstutler, 269 Minn. 153, 130 N. W. (2d) 347; Harris v. United States, 390 U. S. 234, 88 S. Ct. 992, 19 L. ed. (2d) 1067.