## CITY OF ST. PAUL v. DENNIS K. VAUGHN.

237 N. W. 2d 365.

December 12, 1975—No. 45960.

*Pierre N. Regnier,* City Attorney, and *Thomas R. Hughes* and *Daniel H. Mabley,* Assistant City Attorneys, for appellant.

*Michael F. Fetsch,* for respondent.

Heard before Sheran, C. J., and Otis and Yetka, JJ., and considered and decided by the court en banc.

YETKA, JUSTICE.

This is an appeal by the city of St. Paul pursuant to Minn. St. 632.11, subd. 1(3), challenging an order of the Ramsey County Municipal Court suppressing certain items of evidence. The defendant is charged with possession of a hypodermic syringe in violation of § 280.03 of the St. Paul Legislative Code.[1] A Rasmussen hearing was held March 26, 1975, before Judge George O. Petersen to determine the admissibility of an eyeglass case and its contents—two hypodermic syringes, a McDonald stir spoon, a cotton swab, a cap or "cooker," and some burnt matches.

---

[1] The defendant is also charged with possession of marijuana. However, defendant's motion to suppress marijuana seized as a result of the search of his automobile was not opposed by the city and is not appealed.

Defendant's motion to suppress was granted May 12, 1975. We reverse.

On the morning of November 29, 1974, St. Paul Police Officers Charles A. Zajac and Robert R. Patsy were on routine patrol in the Selby-Dale area of St. Paul. As they were proceeding west on Selby Avenue between St. Albans and Grotto, the defendant, driving east on Selby, passed them. The officers mistakenly believed the defendant to be his brother, Frederick Vaughn, whom they knew, on the basis of information a month or more old,[2] to be under a driver's license suspension.

Officers Zajac and Patsy made a U-turn on Selby and pursued the defendant with the squad car's emergency light on.[3] Before they could overtake the defendant, he pulled over to the curb and stopped in front of a drycleaner's establishment at 636 Selby Avenue, approximately a block and a half from the point at which the officers had made their U-turn.

As the officers pulled their squad car up behind the defendant's car, they observed him slide over to the passenger's side of the vehicle, quickly exit, and run into the cleaning establishment. The officers then realized that the defendant was not Frederick Vaughn.[4] Officer Zajac, observing what he believed to be the butt end of a .45-caliber automatic pistol in the hand of defendant, followed defendant into the cleaner's. As Officer Zajac entered the room, he observed defendant tuck something underneath the counter. Zajac retrieved the item, an eyeglass case, and without any suspicion of what its contents might reveal, opened it. Inside the case he discovered the syringes and

---

[2] Officer Zajac testified that he had made a license check on Frederick Vaughn within a month of the incident. Officer Patsy's knowledge of the suspension apparently dated back to the summer of 1974.

[3] There is nothing in the record to indicate whether the officers also activated the squad car's siren.

[4] Although only Officer Patsy testified that he realized at that point that the defendant was not Frederick Vaughn, the court apparently found that both officers discovered the mistake in identity at that moment, a fact which reasonably could be inferred.

the other paraphernalia. Defendant was then placed under arrest.

The trial court based its order suppressing the eyeglass case and its contents on two grounds: First, he ruled that when Officers Zajac and Patsy learned that defendant was not Frederick Vaughn they no longer had probable cause for further investigation of defendant. Secondly, assuming a reasonable basis from Officer Zajac's observation of what he believed to be an automatic pistol, when he discovered it was an eyeglass case, he had no basis for continuing with a search of the case. The trial court rejected the prosecution's contention that the eyeglass case had been abandoned and that defendant therefore lacked standing to complain about the search.

The issues raised on this appeal are:

(1) Were the police reasonably warranted in making an investigatory stop of defendant's automobile based on information, a month or more old, that the driver's license of the person they mistakenly believed to be operating the automobile was suspended?

(2) Once having learned of their mistaken belief as to the identity of the defendant, were the police reasonably warranted in continuing their pursuit of defendant upon observing him quickly exit the automobile carrying what one officer believed to be a .45-caliber automatic pistol and run into a drycleaning establishment?

(3) Did the defendant "abandon" the eyeglass case containing narcotics paraphernalia by placing it underneath the counter of the drycleaning establishment into which he had run while being pursued by police?

At the outset, we feel compelled to state that policemen are average citizens and are not endowed with omniscience. They cannot be expected to know every decision of the courts applicable to the situations with which they are confronted. Frequently they are compelled to act quickly, and on instinct, and with common sense.

While the courts should zealously guard the individual rights of all citizens, we should not adopt rules that so restrict the police that, because of fear of reprimand, they will not act in situations where they should act. Therefore, in a case such as this, the essential question is whether, under all of the circumstances, the police acted reasonably and in such a manner as not to violate the basic constitutional rights held by every citizen.

Looking at this case in that light, what did the police do? They observed an automobile driven by a person they believed to be under driver's license suspension. They followed the car. The driver stopped, but did not allow himself to be identified. If, at this point, he had allowed the police to stop and identify him, the matter would have had to end there. Instead, defendant dashed out, holding something in his possession which looked like the butt of a gun, and went into a drycleaning establishment and disposed of that article.

We see nothing in the rule set out in Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. ed. 2d 889 (1968), which would prohibit the police from following the vehicle in this case; nor have we found any decisions which would prohibit them from picking up the evidence as they did.

In Terry, the Supreme Court said:

"* * * [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U. S. 21, 88 S. Ct. 1880, 20 L. ed. 2d 906 (1968).[5]

The Supreme Court, in the case of Adams v. Williams, 407 U. S. 143, 145, 92 S. Ct. 1921, 1923, 32 L. ed. 2d 612, 616 (1971), said:

"In Terry this Court recognized that 'a police officer may in

[5] Adherence to the rule, although not always by name, has been insisted on by this court. State v. Wicklund, 295 Minn. 403, 205 N. W. 2d 509 (1973); State v. Valstad, 282 Minn. 301, 165 N. W. 2d 19 (1969); State v. Fish, 280 Minn. 163, 159 N. W. 2d 786 (1968).

appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' [392 U. S. 22.] The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. [392 U. S. 23.] A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. [392 U. S. 21-22; citations omitted.]"

Officer Zajac testified that he personally had run a license check on defendant's brother, Frederick Vaughn, approximately a month before this incident. Officer Patsy also testified that he had personal knowledge of Frederick Vaughn's suspension. However, it dated back to the preceding summer, a time span of 3 to 5 months.

A driver's license may be revoked for a period of 30 to 90 days for driving while under the influence, Minn. St. 169.121; for 6 months under our implied-consent law, § 169.123; and for longer periods under the general provisions for revocation, § 171.17, and suspension, § 171.18. Given those periods of suspension or revocation, and absent any knowledge on the part of Officers Zajac and Patsy that Vaughn's license had been reinstated,[6] the stop here is not unreasonable under the standard set forth in Terry v. Ohio, *supra,* and applied to automobile stops by this court in State v. McKinley, 305 Minn. 297, 232 N. W. 2d 906 (1975).[7] The added fact of mistaken identity should not render the stop invalid. The trial court apparently found that the of-

---

[6] There is nothing in the record to indicate that Officers Zajac and Patsy knew when Vaughn's suspension would end.

[7] In People v. Gurule, 175 Colo. 512, 488 P. 2d 889 (1971), the Colorado Supreme Court upheld a stop based on a 2-month-old police bulletin.

ficers acted in good faith, honestly believing that defendant was Frederick Vaughn.[8] Determining the identity of a person observed for only a few moments as he passed Officer Zajac's and Patsy's squad car, and determining whether his license was currently suspended, certainly seems to be a legitimate purpose of investigative stops.

The only reasonable inference which can be drawn from the testimony, and which is not rebutted elsewhere in the record, seems to be that the police officers were justified in believing that defendant was attempting to escape their pursuit.

"In Sibron v. New York [citation omitted] the court points out that '* * * deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to evidence of crime, they are proper factors to be considered in the decision to make an arrest.' Peters' frisk was justified as incident to a lawful arrest rather than as incident to a Terry investigative stop, but the significance of furtive actions and flight is equally applicable to both situations. The officers observed four young men fleeing from the likely target of an armed robbery. The four eluded the plainly marked police car by running through an alley. The officers came upon four young men, believed to be the same four, on the next street. When the police car approached three fled in one direction and one in an opposite direction." United States ex rel. Richardson v. Rundle, 461 F. 2d 860, 864 (3 Cir. 1972).

---

[8] Defendant expresses the fear that mistake in identity serves as a pretext for making an investigative stop where there is otherwise no reasonable basis. In light of State v. McKinley, 305 Minn. 297, 232 N. W. 2d 906 (1975), the fear may be warranted and it may be desirable for trial courts to scrutinize the reasonableness of the mistake. On the record here, however, the mistake appears reasonable. First of all, defendant and the person they believed him to be were brothers. And, second, Officer Zajac testified that he was familiar with the automobile (which belonged to defendant's father) and had observed Frederick Vaughn driving it prior to this incident.

We have recognized that flight from police officers will serve to furnish the basis of an investigative stop. Citing Terry, we said:

"Furthermore, defendant took evasive action, driving down an alley at 40 to 45 miles per hour with his headlights off. As Officer Cecil candidly testified, the original purpose of the patrolmen in pursuing the Cadillac was to ascertain the identity of the driver. His attempts to escape the following squad car further aroused the officers' suspicions and caused their ensuing investigation, an investigation that was both a right and a duty. [Citations omitted.]" State v. Valstad, 282 Minn. 301, 310, 165 N. W. 2d 19, 25 (1969).

Moreover, in addition to defendant's flight, Officer Zajac testified that he observed what he believed to be a .45-caliber automatic pistol in the hand of defendant, which, if determined to be true, would very likely have been a St. Paul ordinance violation. St. Paul Legislative Code, c. 425.

The trial court apparently accepted the testimony of Officer Zajac, but concluded that defendant's conduct did not justify the officers' continued pursuit of defendant upon their learning his true identity. It appears from the lower court's reliance on State v. Gannaway, 291 Minn. 391, 191 N. W. 2d 555 (1971), a case dealing with the permissible scope of a search incident to a traffic arrest, that the court may have been applying a probable-cause standard rather than the less stringent Terry standard. It seems clear that the pursuit was for the purpose of an investigative stop, not necessarily arrest, and that the Terry standard should apply. But, even under the standard applied by the court, the officers were justified as a matter of law in making an investigative stop under these circumstances. This is not a case where the officers acted on a mere hunch that criminal activity was afoot, but rather upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, *supra*.

The final issue is whether there had been an abandonment in the constitutional sense, of the eyeglass case.

"The significance of abandoned property in the law of search and seizure lies in the maxim that the protection of the fourth amendment does not extend to it. Thus, where one abandons property, he is said to bring his right of privacy therein to an end, and may not later complain about its subsequent seizure and use in evidence against him. In short, the theory of abandonment is that no issue of search is presented in such a situation, and the property so abandoned may be seized without probable cause." Mascolo, *The Role of Abandonment in the Law of Search and Seizure: An Application of Misdirected Emphasis,* 20 Buff. L. Rev. 399, 400.[9]

Accordingly, if the eyeglass case was abandoned by the defendant, its warrantless seizure is justified.

The considerations to be weighed in determining whether property has been abandoned have recently been outlined by the Court of Appeals for the Fifth Circuit in United States v. Colbert, 474 F. 2d 174, 176 (1973):

"Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. [Citation omitted.] All relevant circumstances existing at the time of the alleged abandonment should be considered. [Citation omitted.] Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary. [Citation omitted.] *The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.* [Citations omitted.]" (Italics supplied.) See, also, Friedman v. United States, 347 F. 2d 697, 704 to 706 (8 Cir. 1965).

---

[9] See, also, Note, 1974 Wis. L. Rev. 212.

The defendant discarded the eyeglass case in a location to which any member of the public had equal access—underneath the counter of a drycleaning establishment. He argues, however, that his intention was merely to hide the case, not to relinquish his right of ownership. That is not the test.

The distinction between abandonment in the property-law sense and abandonment in the constitutional sense is critical to a proper analysis of the issue. In the law of property, the question, as defendant correctly states, is whether the owner has voluntarily, intentionally, and unconditionally relinquished his interest in the property so that another, having acquired possession, may successfully assert his superior interest. Brown, Personal Property (3 ed.) § 1.6. In the law of search and seizure, however, the question is whether the defendant has, in discarding the property, relinquished his reasonable expectation of privacy so that its seizure and search is reasonable within the limits of the Fourth Amendment. Cf. Katz v. United States, 389 U. S. 347, 88 S. Ct. 507, 19 L. ed. 2d 576 (1967). In essence, what is abandoned is not necessarily the defendant's property,[10] but his reasonable expectation of privacy therein.

Where the presence of the police is lawful [11] and the discard occurs in a public place where the defendant cannot reasonably have any continued expectancy of privacy in the discarded prop-

---

[10] In some cases, of course, the property will be abandoned in the property sense as well, e. g., Abel v. United States, 362 U. S. 217, 80 S. Ct. 683, 4 L. ed. 2d 668 (1960); Friedman v. United States, 347 F. 2d 697 (8 Cir. 1965).

[11] Where property is discarded because of the presence or pursuit of police officers, if their presence or pursuit is unlawful, abandonment will not be found even though intent to abandon is established and the discard openly reveals the nature of the property. Emphasis, Mascolo, *The Role of Abandonment in the Law of Search and Seizure: An Application of Misdirected Emphasis*, 20 Buff. L. Rev. 399, Note, 1974 Wis. L. Rev. 212, 215; Williams v. United States, 99 App. D. C. 161, 237 F. 2d 789 (1956); Hobson v. United States, 226 F. 2d 890 (8 Cir. 1955); Commonwealth of Massachusetts v. Painten, 368 F. 2d 142 (1 Cir. 1966).

erty,[12] the property will be deemed abandoned for purposes of search and seizure.[13] Such is the case here.

Reversed and remanded for trial.

[12] For cases where the defendant has a reasonable expectancy of privacy, see Rios v. United States, 364 U. S. 253, 80 S. Ct. 1431, 4 L. ed. 2d 1688 (1960), and cases discussed in Note, 1974 Wis. L. Rev. 212.

[13] See, e. g., United States v. Colbert, 474 F. 2d 174 (5 Cir. 1973) (briefcases containing guns discarded on public sidewalk); Trujillo v. United States, 294 F. 2d 583 (10 Cir. 1961) (heroin packets discarded on public sidewalk); United States v. Copeland, 263 F. Supp. 976 (S. D. N. Y. 1967) (brown paper bag containing heroin dropped from parked car to street); Molina v. State, 53 Wis. 2d 662, 193 N. W. 2d 874 (1972) (heroin tossed out window of moving car onto public highway); State v. Shaw, 6 Conn. Cir. 17, 262 A. 2d 614 (1968) (betting slip tucked inside newspaper which was discarded on top of a pinball machine in a public poolroom); Application of Zerga, 218 F. Supp. 759 (S. D. N. Y. 1963) (betting slip dropped to floor inside a candy store open to the public).