The state appeals from the trial court's order granting the motion to suppress evidence filed by the appellant, Victor Mitchell. The appellant was charged with unlawful possession of a controlled substance, specifically cocaine, a violation of § 13A-12-212, Code of Alabama 1975, with resisting arrest, a violation of § 13A-10-41, Code of Alabama 1975, and with public intoxication, a violation of § 13A-11-10, Code of Alabama 1975.
The appellant filed a written motion to suppress the cocaine. In support of his motion, he argued:
 "1. That the Defendant's arrest was illegal and improper in violation of the United States Constitution, Alabama Constitution, and case law against unreasonable searches, seizures, and arrest.
 "2. That the Defendant's seizure and subsequent arrest for public intoxication was without probable cause and without a warrant.
 "3. That no public offense was committed in the presence of law enforcement prior to his arrest for public intoxication and in fact no crime had been committed.
 "4. That the initial contact with the Defendant violates Terry v. Ohio [392 U.S. 1 (1968)] and case law forbidding illegal *Page 816 
searches, seizure and detentions without probable cause."
(C.R.43.)
The following evidence was elicited at the hearing on the motion to suppress. Around 9:30 p.m. on May 15, 1996, Officer Michael Neville, of the Decatur Police Department, was proceeding north on Central Parkway, when he noticed a vehicle "stopped in the middle of the road with the hazards going." (R. 6.) Neville testified that parking a vehicle in the middle of the road is a "crime." Neville saw a man, who was later identified as the appellant, and woman standing beside the vehicle. The couple appeared to be arguing and Neville suspected that some sort of domestic dispute might be in progress. The grass median dividing the highway prevented Neville from immediately turning his vehicle around, so he drove past the couple, turned his vehicle around, and drove back to the couple's car. As Neville parked his car, the woman got into the automobile, and the appellant walked away from the scene. Neville radioed for assistance.
When Neville approached the woman, she assured him that she had not been harmed. She told Neville that she and the appellant had been arguing and that the appellant had wanted to get away from the argument. She had been trying to convince the appellant to get back into their vehicle. Neville did not pursue the appellant.
Officer James Tilley responded to Neville's request for assistance. When he approached the scene, Neville motioned for him to follow the appellant. Tilley observed the appellant staggering down the median, near the edge of the road. Tilley testified that there was at that time a "large flow of traffic" (R. 50) on the road. He saw the appellant stumble a few times. Tilley believed that the appellant "could have very easily slipped off in the traffic." (R. 72.) Based upon his observations, he suspected that the appellant might be intoxicated. Tilley stopped his vehicle and approached the appellant.
When Tilley got near the appellant, he noticed that the appellant smelled of alcohol, that he was glassy-eyed, and that his speech was very slurred. Tilley testified:
 "[A]s I'm talking with him, I started making it known to him that I was suspecting him of being intoxicated to a point that I was going to arrest him, and he reached to his pocket, his left front breast pocket, of his shirt and he actually pulled out a couple of [crack] rocks and dropped them, and I grabbed ahold of them and a fight ensued."
(R. 56.)
Defense counsel questioned Tilley at to why the substance of his suppression hearing testimony was not included in the affidavit prepared by the narcotics investigator, Larry Greene, to support the arrest warrant for unlawful possession of a controlled substance.[1] During this line of questioning, the following occurred:
 "Q: You do have in that affidavit at least he was purportedly staggering. You don't have anything in there about speech being slurred or him displaying crack rocks to you or trying to dispose of them, do you? *Page 817 
 "A: This is not my affidavit.
 "Q: Well, Larry Greene goes out and — that is an affidavit for unlawful possession of narcotics, isn't it?
 "A: I believe so. Yes, sir.
 "Q: Okay. You don't think that information would be important to the warrant magistrate?
 "A: If it was my affidavit —
 ". . . .
 "Q: Bottom line it is not in there.
 "A: It is in there about the staggering.
 "Q: Right. Just the staggering. The stuff about the crack . . . and the resistance, it is not in there, is it?
 "A: No.
 "Q: And at that point in time you placed him under arrest, is that correct?
 "A: For public intoxication.
 "Q: That is right. And the for — let me ask you this: had you already placed him under arrest for public intoxication prior to him I guess purportedly displaying these crack rocks to you?
 "A: Yes, sir. When he realized I was going to put him under arrest for public intoxication and when I told him that I believed he had had too much to drink to be out here walking in the public, that is when he started his movements.
 "Q. Did he bolt?
 "A. No, sir. He tried to get the stuff out of his pocket.
 "Q: And did he pull any crack rocks from any other place on his person?
 ". . . .
 "A: I don't recall. I just believe it was his shirt pocket.
 "Q: All right.
 "A: It was two baggies of crack.
 "Q. And now in Mr. Greene's affidavit he states, `Officer Tilley conducted a search of Mr. Mitchell and found two baggies full of crack cocaine in his shirt pocket.' Okay. Now, I want to make sure. Now, is that what happened, or had they been taken out and put on the ground by Mr. Mitchell?
 "A. He was — he was under arrest for public intoxication.
 "Q: Answer my question, Jim?
 "A: I just did.
 "Q: No, you didn't. I asked you whether or not what happened in this affidavit — Larry Greene's affidavit admittedly
 "A: I don't know about Larry Greene's affidavit.
 "Q: Did you tell Larry Greene this?
 "A: No, sir.
 "Q: What did you tell him?
 "A: I gave him my report. He takes the information from that.
 "Q: Okay. Well, have you got your report with you?
 "A: I do not know.
 "Q: Okay. And I guess Mr. Greene is wrong about that scenario?
 "A: Sir, I don't know.
 "Q: Did you put in your report that you conducted a search or that you retrieved them from Mr. Mitchell [who was] trying to take them out of his pocket or from the ground?
 "A: Well, if somebody is under arrest I'll do a search, yes, sir.
 "Q. Okay. Well, which did you do? I'm kind of confused about your testimony here?
 "A. He was under arrest, and I searched him, but he had already tried to take it out and get rid of it. The search was in relation to his actions basically that he was trying to get rid of the evidence."
(R. 57-62.)
During the prosecution's examination of Tilley, the following occurred:
 "Q: And then you placed him — began to place him under arrest for public intoxication, he resisted arrest, is that correct?
 "A. What he was doing is he was trying to get rid of the evidence in his pocket, and when I went to stop him that is when he started —
 "Q: And part of your duties as a police officer when you're called upon to investigate things of this nature and place individuals *Page 818 
under arrest, you talk with the investigating officer, an officer who is assigned to investigate that case, is that correct?
 "A: Sometimes —
 "Q: Once the recommendation is made?
 "A: Well, generally if there [are] narcotics involved we do a report and hand it in. If the narcotics officer has any question, he will come up and ask us. Generally when he reads our report he will take that and ask the questions to the individual, but he wants to make sure the subject understands what is being said. He generally waits until the next day.
 "Q: You were shown an affidavit prepared by an investigator in this case, Officer Larry Greene, weren't you, by the defendant's attorney?
 "A: Yes.
 "Q: That is not your affidavit, and that is something Larry Greene himself wrote up and swore to?
 "A: Yes, ma'am. I have never seen that.
 "Q: And it is not true that that affidavit would contain any and all observations made by you on the night of the arrest of this defendant, is that correct?
 "A: I wouldn't think so.
 ". . . .
 "THE COURT: Officer Greene or Investigator Greene wasn't on the scene, right?
 "THE WITNESS: No ma'am.
 "THE COURT: And so whatever information he had that he completed that affidavit would have come from you or your report?
 "THE WITNESS: Well, he would — normally, Your Honor, in the affidavit he would take out the main points that he felt he needed. I don't know how he does his affidavits. I know that — you know, I don't know if he puts everything that would relate to a case in there. I don't know how he does his affidavits.
 "THE COURT: But in your report would you have put in your report that you seized the evidence, the drugs, pursuant to a search or pursuant to the fact that the defendant had them out of his pocket and was throwing them on the ground?
 "THE WITNESS: Again, Your Honor, as far as that particular report goes, I would probably put in the order of events that it happened, but sometimes in a report you just put things that would spark your memory to refresh you. That is basically what we use it for, not verbatim because there [are] a lot of things, you know, that we understand. When we read a couple of lines we will know what happened in that incident.
 "THE COURT: So would it not be more likely that if the defendant had taken it out of his pocket and in your clear sight and tried to throw it on the ground, would you not have put that information in your report?
 "A. I may have, Your Honor. That seems like it would be something —
 "THE COURT: That would be more likely than just saying, `pursuant to arrest'
 "THE WITNESS: Yes, ma'am.
 "THE COURT: You don't know what you did?
 "THE WITNESS: To be honest with you, Your Honor, I believe I said he pulled out some rock — I'm not exactly sure, but that is what had happened, because there [were] a couple of rocks that fell on the ground, and we had to pick them up from the ground.
 "THE COURT: Were there any other drugs located on the defendant's person?
 "THE WITNESS: No, ma'am, just two plastic baggies of crack cocaine.
 "THE COURT: And they were on the ground?
 "THE WITNESS: No, ma'am. He had them in his pocket.
 "THE COURT: Well, I thought you testified that he took them out of his pocket and threw them on the ground.
 "THE WITNESS: There was some loose rocks, Your Honor. He had loose rocks in his pocket. There was a hole in one of the baggies and they were like loose in his pocket and he was trying to get *Page 819 
them out. But the majority of what he had was still left in his pocket.
 "THE COURT: Which you wouldn't have known about unless you saw him take them out of his pocket and throw them on the ground.
 "THE WITNESS: Yes, ma'am. I seen him go to his pocket, and I seen him pull out a couple of loose rocks. I didn't know he had anything else in his pocket. That is when I grabbed them, because I could see he had something in his hand that he was trying to get rid of. He dropped those, and when we grabbed him and got him handcuffed after a struggle and in his shirt pocket he still had more dope than what he had dropped on the ground."
(R. 73-84.)
Sonja Clemmons, the woman who was with the appellant that night, testified that she was the appellant's girlfriend. She denied telling Officer Neville that she and the appellant had been arguing. Clemmons also testified that the appellant had not been drinking any alcoholic beverages. She denied any knowledge of the drugs.
Following Clemmons's testimony, the defense rested. The following then transpired:
 "THE COURT: How difficult would it be for you to get your report?
 "OFFICER TILLEY: I can go pull it. Do you have a copy of it? Your Honor, she [not identified] has a copy of my narrative.
 "THE COURT: And is that what you testified that Greene — that Investigator Greene would have had?
 "OFFICER TILLEY: He would have had a copy of that, Your Honor. Now, what he done with it, I don't know.
 "THE COURT: But would that have been the information that he would have to make the affidavit for the arrest?
 "OFFICER TILLEY: Yes, Ma'am, it should have been.
 "THE COURT: What does [Tilley's report] say in there about Officer Tilley's observation of the defendant where the drugs came from.
 ". . . .
 "MS. ROBERTS [prosecutor]: While searching Mitchell we located a large amount of what we believe to be crack cocaine from the front shirt pocket.'
 "THE COURT: Is there anything in there about while he is talking to him he observed him pulling it out of his pocket?
 "MS. ROBERTS: No. I'll let him look at this. Your Honor the notes — I reiterate to the Court, Officer Tilley's testimony is that he doesn't put every single thing that happened in the report either so —
 "THE COURT: This is what I'm looking at. If there is any question as to whether or not the stop or arrest was pursuant to probable cause or otherwise, just seems to me that if someone pulls out drugs in your presence you don't have to worry about the other stuff. And to me that would be important to put in the report or to — if that occurred.
 "MS. ROBERTS: Well, you know —
 "THE COURT: You have testified that as you were fixing to tell him that he was going to be put under arrest for public intoxication, he actually pulled two or three — let me get my notes.
 "OFFICER TILLEY: Yes, ma'am. I stated that he — I was telling him that he had had too much to drink.
 "THE COURT: `As we talked I told him I was going to arrest him for public intoxication. The defendant actually pulled out two rocks of crack and threw [them] on the ground.' That is what you testified to.
 "OFFICER TILLEY: Yes, ma'am.
 "THE COURT: But that is not in your report, and you didn't feel that was important to put in your report?
 "OFFICER TILLEY: Well, the report is just to refresh your memory on certain facts, Your Honor. There [are] a lot of times information is not put in a report. Nobody ever reads that except us to refresh our memory.
 "THE COURT: Well, if someone is just standing out on the street corner and you're walking by them and they pull out drugs and throw them on the ground you can arrest them, right, for no other reason than that. *Page 820 
 "OFFICER TILLEY: But as far as — I was arresting him for public intoxication, and when he pulled it out — so, you know, we found the other during the search, but he was already under arrest for public intoxication because I had told him he had had too much to drink to be on the street, and before I could finish my whole statement, he started this thing with his hands, but he was under arrest for public intoxication."
(R. 128-33.)
The trial court then granted the appellant's motion to suppress, without making any findings of fact. The prosecutor announced that the state would be unable to proceed on the possession of a controlled substance case without the suppressed evidence. The appellant waived his right to a jury trial on the charges of resisting arrest and public intoxication and the case was tried before the same trial judge who had entertained the suppression motion. The parties agreed to submit the case on the evidence presented at the suppression hearing. The trial court acquitted the appellant of the charges of resisting arrest and public intoxication.
The state contends that the trial court erred in granting the appellant's motion to suppress the cocaine. In support of its position, the state maintains that Officer Tilley properly seized the cocaine found in the appellant's pocket based upon the "incident to a lawful arrest" exception to the search warrant requirement. The state argues that the cocaine thrown on the ground was properly seized because it was "abandoned property" and the appellant therefore had no expectation of privacy in regard to that cocaine.
 "This court has long held that warrantless searches are per se unreasonable, unless they fall within one of the recognized exceptions to the warrant requirement. See, e.g., Chevere v. State, 607 So.2d 361, 368 (Ala.Cr.App. 1992). These exceptions are: (1) plain view; (2) consent; (3) incident to a lawful arrest; (4) hot pursuit or emergency; (5) probable cause coupled with exigent circumstances; (6) stop and frisk situations; and (7) inventory searches. Ex parte Hilley, 484 So.2d 485, 488
(Ala. 1985); Chevere, supra, 607 So.2d at 368. `Where a search is executed without a warrant, the burden falls upon the State to show that the search falls within an exception.' Ex parte Tucker, 667 So.2d 1339, 1343 (Ala.), cert. denied, 516 U.S. 944, 116 S.Ct. 382, 133 L.Ed.2d 305 (1995), citing Kinard v. State, 335 So.2d 924 (Ala. 1976)."
Rokitski v. State, 715 So.2d 859, 861
(Ala.Cr. App. 1997).
In order to decide whether the cocaine was properly seized during a search incident to a lawful arrest, we must determine whether the appellant's arrest was proper. This question cannot be resolved without first determining whether Officer Neville was authorized in initially stopping to investigate a situation he suspected involved domestic violence.
 "Section 15-5-30, Code of Alabama (1975), authorizes the police, without probable cause, to `stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and [to] demand of him, his name, address and explanation of his actions.' Thus, a person may be stopped and questioned for investigatory purposes although the circumstances fall short of the probable cause requirement. Scurlock v. State, 487 So.2d 286 (Ala.Cr.App. 1986).
 "`"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and to allow a crime to occur or a criminal to escape. On the contrary, Terry [v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] recognizes that it may be the essence of good police work to adopt an intermediate response. See [Terry, 392 U.S.] at 23, 88 S.Ct. at 1881. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Adams v. *Page 821 Williams, 407 U.S. 143, 145-46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).' "Walker v. City of Mobile, 508 So.2d 1209, 1212
(Ala.Cr.App. 1987)."
Harris v. State, 568 So.2d 421, 422
(Ala.Cr. App. 1990). (Emphasis added.) "[A] public roadway is a public place within the meaning of § 15-5-30." White v.State, 479 So.2d 1368, 1375 (Ala.Cr.App. 1985).
Under the facts of this case, Officer Neville acted appropriately in investigating the situation. Even without the threat of domestic violence, Officer Neville would have been authorized to stop and investigate. The appellant and his companion had stopped their vehicle in the middle of a public roadway and had turned on the hazard lights — a signal that often indicates that a motorist is in distress. Officer Neville had no way of knowing whether the situation involved simply a motorist in distress or something more sinister, such as domestic violence. Under these facts, he would have been remiss had he not stopped to investigate. Once he stopped, he was entitled to obtain an explanation of the situation from the appellant and his companion. See § 15-5-30, Code of Alabama 1975.
We now turn our focus to the question whether the appellant was lawfully arrested. Section 15-10-3(a)(1), Code of Alabama 1975, provides that "[a]n officer may arrest a person without a warrant, on any day and at any time . . . [i]f a public offense has been committed or a breach of the peace threatened in the presence of the officer." See also Rule 4.1(a)(ii), Ala.R.Crim.P. The offense of public intoxication is defined at § 13A-11-10, Code of Alabama 1975, which provides, in pertinent part:
 "A person commits the crime of public intoxication if he appears in a public place under the influence of alcohol, narcotics or other drug to the degree that he endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity."
When Officer Tilley arrived to assist Officer Neville in investigating the situation, he noticed the appellant stumbling and staggering in the median of a public roadway. The appellant was near the edge of the road and was in danger of falling into traffic. Officer Tilley noted that the appellant smelled of alcohol, that his speech was slurred, and that his eyes were "glassy." Given these facts, Officer Tilley could reasonably conclude that the appellant was intoxicated and that he posed a danger to himself and to others. Thus, Officer Tilley was authorized to arrest the appellant without a warrant for the offense of public intoxication and to search the appellant pursuant to the arrest.
From the evidence in this case, it is not clear whether the arrest of the appellant was completed before his pocket was searched; however, it does not matter that the appellant may not have been technically arrested before the officer searched his pocket. "A search conducted immediately prior to an arrest may be justified as incident to arrest if the police had probable cause to arrest the suspect before conducting the search." Price v. State, [Ms. CR-92-0882, June 20, 1997] ___ So.2d ___, ___ (Ala.Cr. App. 1997). As noted above, the arresting officer had probable cause to believe that the appellant was guilty of the offense of public intoxication. Thus, despite the fact that there was some confusion as to whether the search of the appellant's pocket occurred before or after the arrest of the appellant was completed, we conclude that the search of the appellant and the subsequent seizure of the cocaine found on the appellant was proper because it was incident to a lawful arrest.
The seizure of the cocaine discarded by the appellant was proper under the abandoned property exception to the general rule requiring a search warrant.
 "`"In the law of search and seizure . . . the question is whether the defendant has, in discarding the property, relinquished his reasonable expectation of privacy so that its seizure and search is reasonable within the limits of the Fourth Amendment. . . . In essence, what is abandoned is not necessarily the defendant's property, but his reasonable expectation of privacy therein. "`"Where the presence of the police is lawful and the discard occurs in a public place where the defendant cannot reasonably have any continued expectancy of privacy *Page 822 
in the discarded property, the property will be deemed abandoned for purposes of search and seizure."' W. LaFave, 1 Search and Seizure 2.6(b) at 465, quoting from City of St. Paul v. Vaughn, 306 Minn. 337, 237 N.W.2d 365 (1975)."
Harrell v. State, 555 So.2d 257, 260 (Ala.Cr. App.), aff'd, 555 So.2d 263 (Ala. 1989).
A trial court's ruling on a motion to suppress will not be overturned unless it is palpably incorrect. Parker v.State, 587 So.2d 1072, 1088 (Ala.Cr.App. 1991), on remand,610 So.2d 1171 (Ala.Cr.App.), aff'd, 610 So.2d 1181 (Ala. 1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737
(1993). Although the trial court did not make specific findings of fact in support of its decision to grant the motion to suppress, we can infer from the record that the motion was granted because of the discrepancy between the testimony of Officer Tilley and the information contained in his report and the affidavit prepared by Investigator Greene regarding where the cocaine was located at the time of the search. We believe that the trial court's conclusion was erroneous.
First, it appears that the trial court placed undue emphasis on Investigator Greene's affidavit and Officer Tilley's report. Tilley testified that he did not prepare the affidavit. Furthermore, he testified that the report he prepared, which was used by Greene to prepare the affidavit, was not a complete rendition of the facts. Thus, an argument can be made that the facts are not even in dispute; rather, the affidavit and the incident report are simply incomplete.
Second, even if we were to assume that Officer Tilley found the crack cocaine only in the appellant's pocket and that the appellant did not, as Tilley testified, discard some of the crack cocaine, suppression of the cocaine was still not warranted. As discussed above, Officer Tilley was authorized to arrest the appellant for public intoxication; therefore, the subsequent search of the appellant's pocket was incident to a lawful arrest. Thus, it appears that under either fact scenario — whether some of the cocaine was discarded and some was found in the appellant's pocket or whether all of the cocaine was recovered from the appellant's pocket — the seizure of the cocaine was lawful.
We therefore hold that the trial court erred in suppressing the cocaine. Accordingly, the trial court's order granting the motion to suppress is reversed, and this cause is remanded to the trial court.
REVERSED AND REMANDED.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.
[1] Tilley testified that he did not arrest the appellant at the scene for unlawful possession of a controlled substance. He testified that the narcotics investigator was responsible for arresting the appellant for that offense. Tilley prepared an incident report that was used by Investigator Greene to prepare the affidavit.
The affidavit prepared by Investigator Greene was not introduced into evidence, but it is included in the record on appeal. The affidavit reads in relevant part:
"On May 15th, 1996, at approximately 9:20 PM Officer Neville saw a white Mitsubishi Eclipse vehicle on Central Parkway with its emergency flashers on and observed a black male and a black female standing outside the vehicle having some type of discussion. Officer Neville turned around and approached the vehicle and the black male walked south. Officer Tilley . . . was in the area and told Officer Neville he would check the subject. Officer Tilley saw the subject walking south, staggering. Officer Tilley stopped and identified him as Victor Mitchell. Officer Tilley noticed Mitchell had an odor of alcoholic beverage on his breath. Officer Tilley arrested Mitchell for public intoxication and resisting arrest. Officer Tilley conducted a search of Mitchell and found two baggies full of crack cocaine in his shirt pocket. Mitchell was also charged with unlawful possession of a controlled substance."
(C.R.3.)